ORIGINAL

# UNITED STATES
# COURT OF FEDERAL CLAIMS

FILED
JAN 19 2000
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MUSTAFA M. ZEIN, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 99-244C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 85

Place: Washington, DC

Date: January 13, 2000

NOT FOR PHOTOCOPYING

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MUSTAFA M. ZEIN, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 99-244C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom 8, Room 512
National Courts Building
717 Madison Place, N.W.
Washington, D.C. 20005

Thursday
January 13, 2000

The parties met, pursuant to the Notice of the Judge, at 2:05 p.m.

BEFORE: HON. ROGER B. ANDEWELT
Judge

APPEARANCES:

For the Plaintiff:

MUSTAFA ZEIN, PRO SE
c/o Robert W. Thabit
172 82nd Street
Brooklyn, New York 11209
(718) 748-6861

For the Defendant:

SEAN LANE, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
(202) 307-6288

P R O C E E D I N G S

(2:05 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, Roger B. Andewelt presiding.

THE COURT: Good day. Be seated, please. We're here for an oral argument today, the Defendant's motion to dismiss for lack of jurisdiction based upon running of the statute of limitations in Zein versus the United States, Civil Action No. 99-0244C.

If we can start with representatives identifying themselves for the record.

Plaintiff?

MR. ZEIN: Mustafa Zein, Your Honor. That's me.

MR. LANE: Sean Lane for the United States.

THE COURT: Okay. One thing we never resolved is the questions of confidentiality. Does this hearing need to be on the open record from the Government's perspective?

MR. LANE: Well, Your Honor, our motion to discuss is based on the complaint, which is not under seal, and you've relied on materials that are not under seal in the record. I'm not sure Mr. Zein intends on relying on any of the materials that have been put under seal by this Court, so we do not at this time.

THE COURT: Okay. I have been asked questions

about the contract. And at that point in time, if you think it's appropriate or necessary -- if you think it's necessary to put it under seal, we'll go ahead and we'll put it under seal. And we'll exclude everybody from the courtroom who isn't appropriately here.

MR. LANE: Okay. Thank you, Your Honor.

THE COURT: Okay. Mr. Zein, I know you're not a lawyer, although you seem to have a good grasp of the law, judging from your writings. But you understand that, while you're not represented by counsel, when you say representing yourself is going to be binding on you. And you understand about the statute of limitations.

There isn't -- we're not confronting any question about whether you were wronged by the government, whether there was, indeed, a breach of contract. We're not necessarily focusing on that. We're really just focusing on the question about whether or not the statute of limitations has run in this particular case. Okay?

Now, that's going to involve some requirement for me to go into the terms of the contract and understand what happened and when it happened. And, again, I'm going to rely upon the Government, when I ask the questions, ask for sealing of record, if it's appropriate, okay? Now, you understand about the six-year statute of limitations?

MR. ZEIN: Yes, Your Honor.

THE COURT: Okay. Now, first, I want to talk with you about the nature of the contract, okay, what happened, who were the contracts with, and who were you acting for, and essentially just general background of what went on here. Okay. So let's go back to the time period in issue. Okay? Take me back to 1985 when you were approached by representatives of the United States.

MR. ZEIN: Then I have to go through the sealed record, Your Honor. And I need immunity from -- it violates the order of --

THE COURT: Okay. You'll have to speak into the microphone.

MR. ZEIN: I'm sorry, Your Honor.

THE COURT: Okay. I'm asking you now what happened.

MR. ZEIN: Then I have to go through the sealed record.

THE COURT: Tell me what happened. That's all. We don't have to look at the documents. We -- from what --

MR. ZEIN: Then I will have to quote them. Then I have to quote what is in them if it is possible.

THE COURT: Okay.

MR. LANE: Your Honor, let me just explain from the outset, I am not intimately familiar with all of the proceedings in the Southern District of New York. So I

certainly will go along with Mr. Zein's representations about whether he's going to use documents that are sealed.

And I suppose the Government's approach is one of an abundance of caution, given that there certainly were a number of proceedings that I am only vaguely familiar with that stretch over a number of years. So if Mr. Zein represents that he's going to rely on sealed materials and quote from them, in an overabundance of caution --

THE COURT: Okay. Are you -- these are materials that are now presented to this Court. Do you think they are appropriately confidential?

MR. LANE: Well, Your Honor, I confess we have not crossed that threshold. What the -- originally, we took no -- the Government took no position on whether these materials should be sealed or not.

And then after further reflection and an order from the Court, what we did is specified pages that we understood were still -- contained information that might still be under seal in another court. And that's the basis for any sealing at this point, not whether these materials are properly confidential when they have, in fact, been placed under seal by another court.

MR. ZEIN: Your Honor, may I say something?

THE COURT: Yes.

MR. ZEIN: I'm sorry this is not very accurate,

what my honorable opponent has told you now. The court in New York did not, by its own self, order everything under seal. The Government of the United States came crawling to the Court on hands and knees seeking the relief from the court. And I have included some of the letters. At the same time, Your Honor, I wanted to get to the Court the evidence today because I was expecting something like this to happen.

THE COURT: Well, nothing's happened yet. I don't think what you're saying is inconsistent with what the Government has said.

MR. ZEIN: But, Your Honor, I mean, you know, they go in New York and they say it is national security at stake. And the last time they sought relief from the court, Your Honor, was in January 1998. Now, what happened between 1998 and today that they haven't made up their mind? See, I would like to know.

THE COURT: Okay. Well, there are a lot of issues I know that you're curious about, and there are a lot of wrongs that you think were done to you. But you have to understand, at this point, the focus of this case --

MR. ZEIN: Is the facts.

THE COURT: -- is very narrow. It's just a statute of limitations, and that's all it is. And what I have to do is I have to understand enough facts so I can

make a determination on the statute of limitations issues.

MR. ZEIN: Right.

THE COURT: And if you survive that, the case survives that, then we have to get into a lot more of the substantive issues here.

MR. ZEIN: Okay. Your Honor, because you see the balance of justice is two hands. On one hand, the Defendant has the statute of limitations. On the other hand, you have the negating factor for the statute of limitations because the Defendant raised it in his own motion, Your Honor. He mentioned that it is only appropriate to get equitable tolling --

THE COURT: Okay. We will get to that.

MR. ZEIN: -- if I can prove fraudulent concealment.

THE COURT: We'll get to that.

MR. ZEIN: So when we want -- so if we can narrow, Your Honor, the discussion on the statute of limitations, we have to include in it the negating factor, which is the fraudulent concealment. And by the way, Your Honor, two days ago in New York, the whole documents that have been filed in 1997 in the Clerk's Office, including the dockets, disappeared from existence completely.

THE COURT: Okay.

MR. ZEIN: You see, I'm still -- you know, there

are so many factors that are involved in this. I mean, I went -- the minute I came to Your Honor's court, I went to the clerk. I said, please show me --

THE COURT: The Clerk's Office in which court?

MR. ZEIN: In your Court, Your Honor.

THE COURT: Yes.

MR. ZEIN: And he showed me the dockets; he gave me, you know, three copies. I paid for them and, you know, you have the time for filing. You know, this has been filed on so-and-so. You have an indication of Your Honor's order, everything. When I went, I got it in New York that everything has disappeared from the Clerk's Office.

THE COURT: I don't know, at this point, the extent to which that's important or not to the narrow issue I have before me now.

MR. ZEIN: Right.

THE COURT: Let's -- let me go back. I have to understand what's going on, so let me go back. I don't want you to use individual names now. We'll stay on the open record until the Government thinks we should go off the record.

MR. ZEIN: Okay.

THE COURT: But I want to know what happened in 1985 when representatives of the Government -- and just leave it at that -- the representatives of the Government

came to you, and tell me the story of 1985 that resulted in the contract. And I want you, when you're telling me the story, tell me what the terms were, you believe, of that oral contract.

MR. ZEIN: Your Honor, let's -- I have had a relation with the Government for 16 years, as the sealed court records show, and I was acting as an aviator. I forged a very, very close friendship, even a brotherhood with certain officers of the United States Government. And I was the man in the right place at the right time, doing what has to be done for no fee, as the sealed court records show.

As a matter of fact, if there was anybody in the whole Middle East who always saved the United States Government from extreme dangers, it would have been me. And many books were written, Your Honor, on it, best-sellers and television programs, but I never participated in that. I was doing it for nothing.

When the case of the hostages came into being in Lebanon, as the sealed court record shows -- and I'm not divulging any information, more than general -- the Government came to me at last, because when I do things, I do it straightforward, period. They tried many ways to get that problem resolved. They couldn't. As a last resort, they came to me.

And, by the way, Your Honor, those people are ready to come and testify live in your Court; not for the Defendant, for the Plaintiff, to repeat the same thing that I'm repeating to Your Honor today, which I will be held responsible for every word I say to you. And I put a plan, but I said --

THE COURT: Okay. What did they say to you?

MR. ZEIN: They said we have to make a plan to get the hostages released from Lebanon. I said, but we have to put a realistic plan. And I described that it gives everyone its piece of cake in the Middle East.

THE COURT: Okay. So you put together a plan?

MR. ZEIN: It was approved.

THE COURT: Okay. And what was the plan?

MR. ZEIN: The plan, Your Honor, I have to go to the sealed record, which I described it in detail.

THE COURT: Tell me what the plan is.

MR. ZEIN: Right now? Okay. The plan was, without getting the 17 prisoners in Kuwait out, there was no chance for the Americans to be released in Lebanon. And for this reason, Your Honor, I was used as a buffer zone to give the Government the opportunity to deny any involvement.

But in order to get those 17 in Kuwait released, I had to approach the people involved directly through another organization, which has a good relation with the people who

are holding the hostages at the same time with the State of Kuwait.

And you know in the Middle East, Your Honor, when somebody is putting his life on the line, nobody thinks he's doing it for nothing. And these people were trying to get a debt, as I explained to Your Honor in those records, from another individual in London. So I told them I can provide you with that in order not to do anything.

THE COURT: You could provide them with what?

MR. ZEIN: Provide you with what he owes them in order to prevent them from doing anything in London. At the same --

THE COURT: Did the Americans care about what happened in London? They didn't ask you to do anything about --

MR. ZEIN: No. They told me to offer them something.

THE COURT: To offer --

MR. ZEIN: The organization something for their -- because they said --

THE COURT: To get the Americans?

MR. ZEIN: No, to get to the organization that holds the Americans to facilitate my contact with the organization. The ones who were holding the Americans didn't want anything. They wanted the people in Kuwait,

period.

THE COURT: So how did money get into this?

MR. ZEIN: This organization, to get the Palestinian Organization, Your Honor, to get into -- to open doors for me with the direct holders, the American side said they won't believe that you are doing it for nothing. They wouldn't do it thinking that you are using them for your own benefit. So I said, what can we do? They said, offer them something. You see, Your Honor --

THE COURT: So you're saying --

MR. ZEIN: -- the whole Middle East was, you know, blowing up. I was taking trips to Lebanon that I had to write my own will before I leave from here. I was crossing roads --

THE COURT: I understand. But I'm trying to understand what happened then, in terms of -- you said that the Palestinian Organization, which you refer to in your complaint, was willing to let the American hostages go free if the 17 prisoners in Kuwait were freed.

MR. ZEIN: No, Your Honor. The Palestinians were not holding the hostages. Another organization, Islamic organization, was holding the hostages. I was using the Palestinian Organization to get to that organization that was holding the hostages.

The American side, they said when you're asking a

favor from this particular organization, Palestinian Organization, they will do it more appropriately if you offer them an incentive, because they are not going to believe you that you are doing it for nothing.

THE COURT: And your plan was to offer what incentive?

MR. ZEIN: The money to get the contact.

THE COURT: How much money?

MR. ZEIN: $3 million.

THE COURT: $3 million.

MR. ZEIN: And the contact was made. To make sure, Your Honor, that they will honor their contract, the other side, I said payment on delivery.

THE COURT: Payment on delivery of what?

MR. ZEIN: Of the hostages.

THE COURT: Of the American hostages?

MR. ZEIN: Of the American hostages.

THE COURT: Okay.

MR. ZEIN: And it went fantastically. I even got one of the hostages out, Reverend Weir. But outside, Your Honor, even in the congressional investigation, they say the Government did it through other means. No. A Government agency -- you have testimony of a Government agency saying exactly what I'm saying.

THE COURT: Okay. But I want to make sure I

understand. The terms of the agreement that you put together --

MR. ZEIN: The terms are payment under delivery -- upon delivery.

THE COURT: Okay. Now, who will pay who?

MR. ZEIN: The American side will give me the money, and I will give the money to the organization that facilitated the contacts.

THE COURT: Okay. So you promised the organization $3 million if they released the hostages?

MR. ZEIN: Exactly. If they helped me with the other organization to release the hostages.

THE COURT: Right. But the help wasn't $3 million. It was the release of the hostages?

MR. ZEIN: I promised them in the beginning payment on delivery. That's why you're right, Your Honor, absolutely. I'm not going to give any money to anybody unless they deliver.

THE COURT: Okay. Now, that's the oral contract that you're suing on?

MR. ZEIN: But that was changed, Your Honor. That's not the full contract.

THE COURT: Okay.

MR. ZEIN: I went to Lebanon, and I did what I promised. During my activities to release the hostages,

Your Honor, which proved to be successful, releasing one, and brought evidence, pictures, the whole issue, while I was visiting the areas where the hostages were held and putting my life on the line, the American side plants a bomb killing 80 people and maiming 450. And I was supposed to be in that.

I called Washington. I missed that bomb by 15 minutes, and Washington knew the date, the place of the meeting and where I would be. And that's where the bomb took place, Your Honor.

I called Washington. I said, what happened? They said, our people did it, and we don't know anything about it. And I believed them, because the people that I was dealing with are honest, of the highest type. I said, but these are your people, and they caught three of them.

THE COURT: What changed --

MR. ZEIN: So he said -- yes, he said, now change the contract.

THE COURT: Change the agreement that --

MR. ZEIN: The agreement, the original one.

THE COURT: Right.

MR. ZEIN: And I still have those people, Your Honor, who are willing to come to your Court and tell you how the agreement was changed.

THE COURT: Okay. What did they tell you to

change?

MR. ZEIN: To protect the hostages.

THE COURT: No. What did they -- how was the contract changed?

MR. ZEIN: Oh, the contract was changed into tranches, half a million each tranche.

THE COURT: Half million each --

MR. ZEIN: Each section to be paid.

THE COURT: The same $3 million?

MR. ZEIN: Right; into six.

THE COURT: Into six?

MR. ZEIN: Payments.

THE COURT: And when were the payments -- these payments be made?

MR. ZEIN: Every step that is finished should be given.

THE COURT: What were the steps?

MR. ZEIN: The steps: To contact the State of Kuwait, to protect, no retaliation. First, to get the Palestinians and everybody involved not to retaliate against the hostages for all the victims that fell into that bomb, to contact the State of Kuwait. And it is completely -- one by -- step-by-step in those papers, Your Honor, which the Government confirmed to the Court.

THE COURT: Okay. Then you went and represented

the Palestinian Organization, this new structure, of six payments of a half million dollars?

MR. ZEIN: Exactly. And they did more than four steps what the Government asked, and asked for the payment, and the Government promised to come to us, and we'll send it to you. We have been, you know, delaying the payments, so we can give it to you in one tranche.

When I came to Washington, Your Honor, I was going back and forth. But before, Your Honor, let me go backward a little bit. With these representatives, I said, you guys, you have to go and get approval from the White House on this, because I want to get to the top.

THE COURT: Is this the three steps or the six steps?

MR. ZEIN: All of it.

THE COURT: So it was after the decision to make --

MR. ZEIN: Right. I said, because I know you are not allowed to pay a certain amount of money that exceeds $100,000; I know that. Many times, I paid it from my own pocket, Your Honor, through the 16 years.

THE COURT: Okay. But not -- okay. But not in this case?

MR. ZEIN: You're talking about $500,000.

THE COURT: All right.

MR. ZEIN: I said, look at the approval first. They came and assured me that they got the approval. I said, I don't also want anybody involved into any side-track activities to get the hostages out, because you see, don't put a price on them because you will be undermining my own efforts, because if the basic principals are talking to each other direct in a way, why would they deal with me? They agreed.

And the release of Benjamin Weir was the proof, you know, by leaving him in front of the American Embassy by himself, not giving him to the Syrians like the others, they were indicating -- the kidnappers, the holders of the hostages -- they have approved the independent land which I gave them.

And to give you the approval -- the proof of the approval, they gave me a picture of each hostage with my Newsweek of that week in front of them with Vanessa Williams on the cover, which I brought to Washington to show that the agreement has been approved, the plan has been approved, and everything has gone.

THE COURT: Now, I'm trying to understand, is this a contract with you, or is this a contract with you acting, in effect, as an agent for the U.S. Government?

MR. ZEIN: I, as a guarantor, Your Honor, not agent.

THE COURT: As a guarantor?

MR. ZEIN: I was guaranteeing the American Government that they will pay on time. It wasn't money to me, Your Honor.

THE COURT: Okay. So that's -- those are the -- is there anything else in the contract that you're suing in this courthouse, any other terms?

MR. ZEIN: No, Your Honor. The contract was breached. They couldn't --

THE COURT: No, no. I just want -- I'm just talking now about the terms of the contract. We'll get to the breach next.

MR. ZEIN: The terms in that -- the two parties who agreed to -- I mediated between them, and who agreed, and was the guarantor for the American side. The American side did not fulfill its obligation to that party, and I was held as a guarantor.

THE COURT: I know. You're talking now about the breach. I want to make sure I have all of the terms of the contract.

MR. ZEIN: The terms, as I told you, as --

THE COURT: There are no additional terms?

MR. ZEIN: No.

THE COURT: Okay. Now, tell me about the breach.

MR. ZEIN: When I came back, Your Honor -- and now

I have to go into something very confidential to tell you why the breach --

THE COURT: About what?

MR. ZEIN: Why the breach. I mean, nobody --

THE COURT: I don't care about why the breach at this point. I just want to know --

MR. ZEIN: Oh, okay. It was impossible for the people who were representing the Government to go further. They couldn't. And they know. I mean, it was like somebody putting a bullet in my head.

THE COURT: And they told you what about the contract?

MR. ZEIN: We cannot go through with it anymore.

THE COURT: Okay. And when was this?

MR. ZEIN: And we can -- it was in July '85.

THE COURT: Okay. In July 1985, the Government representatives tell you --

MR. ZEIN: Yes, but we will do our best.

THE COURT: -- in effect, from your perspective, we're breaching this agreement --

MR. ZEIN: But we will try. You know, it was like they start -- you know, we will try, and we will keep trying to get you, because they knew I was practically dead.

THE COURT: They were trying to get you what?

MR. ZEIN: To get the money from other sources,

and they told me, give us time. And they did try, Your Honor, in August. And they -- I waited till September '85.

THE COURT: Okay. What happened in September '85?

MR. ZEIN: Nothing panned out. October, nothing, and November, nothing. In November, I know they couldn't do anything. You know why, Your Honor? Because I know of the other thing that was taking place.

THE COURT: Okay. So you knew --

MR. ZEIN: In order that --

THE COURT: You knew that they weren't going to give you the money?

MR. ZEIN: No. And they weren't --

THE COURT: No, meaning yes?

MR. ZEIN: Yes, Your Honor, they weren't going to give me the money, because another plan was set in motion, and I know about it.

THE COURT: Okay.

MR. ZEIN: And they will try -- some other people in the same organization tried to get me involved in it, so I can get the money from it without divulging more information. And I said, no, because that's not the right way.

THE COURT: Okay. So then you knew they were breaching the contract by November '85?

MR. ZEIN: Right.

THE COURT: Okay.

MR. ZEIN: Plus, Your Honor, I knew, too, that my name was written on that bomb, because the people who were caught confessed to it. And I was very surprised, extremely surprised. Even the people today, they are still shocked.

THE COURT: Okay. So now we have November '85, you have knowledge that this contract is breached.

MR. ZEIN: Uh-huh.

THE COURT: As you know, we add six years to that; we get to '91. The answer to the Government's argument is that the statute of limitations, assuming everything you're saying is true --

MR. ZEIN: November '91.

THE COURT: November '91.

MR. ZEIN: Right. That's what happened in February '91, Your Honor,

THE COURT: What happened in February of '91?

MR. ZEIN: This, Your Honor.

THE COURT: What are you showing me?

MR. ZEIN: The dockets.

THE COURT: From what document is this?

MR. ZEIN: From the Government.

THE COURT: I know. But I'm trying -- do I have a copy of this?

MR. LANE: Your Honor, if I could assist, I

believe he's referring to a memorandum filed earlier, page 56.

THE COURT: Okay. Through the Government memorandum?

MR. LANE: Something filed by Mr. Zein in -- May 28th of 1999.

THE COURT: Okay. This is the criminal case involved?

MR. LANE: Correct.

THE COURT: Okay. Tell me about the criminal case.

MR. ZEIN: You know, I'm not going to violate the order or the record, but I can go --

THE COURT: We don't -- we're going to look at the documents.

MR. ZEIN: I know.

THE COURT: Just tell me what happened to you; okay.

MR. ZEIN: Your Honor, I won this case.

THE COURT: What was the case?

MR. ZEIN: Whatever --

THE COURT: What was the case?

MR. ZEIN: Your Honor, the case that this same organization went to London to collect its debt --

THE COURT: I want to know what -- was it an

indictment?

MR. ZEIN: Yes, they brought an indictment versus Zein.

THE COURT: What did the indictment accuse you of?

MR. ZEIN: Of contacting terrorist organizations to collect a ransom by phone.

THE COURT: Organizations. Now, to collect ransom; right?

MR. ZEIN: Uh-huh.

THE COURT: Okay. Now --

MR. ZEIN: The same organization that I was asked by the Government to contact to get the hostages out.

THE COURT: Okay. But this is -- you were going to contact the same terrorist organization to collect a ransom for?

MR. ZEIN: It is the debt that this gentleman owed them for collecting the money designated to orphans and widows, and he kept it in his pocket in spite of his worth, more than $2 billion.

THE COURT: Let me go back, if I could, just for a second back to 1991. Now, you alleged in the complaint you paid?

MR. ZEIN: No, I furnished the payments. I got the payment from the man.

THE COURT: I'm not talking about the indictment.

I want to go back to the original contract. I'm sorry for switching around.

MR. ZEIN: No. You see, in 1991 --

THE COURT: Did you make a payment?

MR. ZEIN: In '86?

THE COURT: In '86.

MR. ZEIN: Yes.

THE COURT: Of your own money?

MR. ZEIN: No. I accepted to get them the money so they don't ask me to pay the money the Government promised them. I paid the debt for the Government.

THE COURT: Your money?

MR. ZEIN: Not my money, Your Honor. The money that they owed from this man, I negotiated the thing to get the money for them, so to consider what I owe them on behalf of the Government of the United States is fully paid.

THE COURT: Okay. And that's what happened?

MR. ZEIN: That's what happened.

THE COURT: So you --

MR. ZEIN: In other words, I compromised myself to pay the debt.

THE COURT: Okay. But you didn't pay out-of-pocket any money?

MR. ZEIN: Not -- no, not my pocket.

THE COURT: Okay.

MR. ZEIN: They got the money which they owed, which is owed to them. It wasn't a ransom, I mean, you know in the strictest sense of the word.

THE COURT: Okay. Are you saying that what you're accused of is the indictment was your actions --

MR. ZEIN: To pay the Government debt.

THE COURT: -- to pay the guarantee that you say the Government --

MR. ZEIN: Right. And the Government came and told the judge that. It's not my truth, Your Honor. It's the Government's truth in camera.

THE COURT: Okay. So that's February '91 you're indicted?

MR. ZEIN: No.

THE COURT: When were you indicted?

MR. ZEIN: You see, Your Honor, how clean it is? '86, I was indicted.

THE COURT: Okay. You were indicted in '86?

MR. ZEIN: And I spent 30 months in jail.

THE COURT: Okay. Until when?

MR. ZEIN: June '88.

THE COURT: All right.

MR. ZEIN: That's when the docket started, in June '88. You see, the docket of '86, '87 and '88 till June disappeared from total existence.

THE COURT: So June '88 you were freed?

MR. ZEIN: The judge set me free.

THE COURT: Okay. All right. And when you add six years to the 1988 --

MR. ZEIN: To the '88; right.

THE COURT: Okay. And we get to '94.

MR. ZEIN: No. But, you see, in '91 -- let's get --

THE COURT: That's what I'm just working --

MR. ZEIN: Let's get to '91, see --

THE COURT: You're free in '88.

MR. ZEIN: Right; but I promised the judge, Your Honor, and I promised the Government. Can you imagine they --

THE COURT: You promised the judge what?

MR. ZEIN: That I will not make any movement until the hostages are out. And I kept my word, Your Honor.

THE COURT: When were the hostages out?

MR. ZEIN: '91.

THE COURT: February '91?

MR. ZEIN: After that back in Kuwait, the hostages -- the American -- because, you see, the 17 in Kuwait who went into the bombing spree in Kuwait against Iraq were freed by the Iraqi soldiers who occupied Kuwait. The minute they were freed, Your Honor, the hostages of Lebanon were

released according to the plan.

THE COURT: Okay.

MR. ZEIN: And by the way, you know, Your Honor, in --

THE COURT: And that --

MR. ZEIN: -- in '87, when the whole scandal broke out, they came to me to resurrect the old plan again to help them, and I tried, for no reason whatsoever. And I knew what was going on in there, and I had them by the throat. I had that administration by the throat. And I didn't use it. I kept my mouth shut.

THE COURT: Okay. So you say you promised the judge that you wouldn't do anything until when?

MR. ZEIN: The hostages are released.

THE COURT: Did the judge ask you for this?

MR. ZEIN: Yes.

THE COURT: Okay. When were the hostages released?

MR. ZEIN: The end of 1991, you know, somewhere in '91, Your Honor.

THE COURT: Sometime '91.

MR. ZEIN: Right. So I went --

THE COURT: Okay. So let's say it's December of '91, we add six years to that --

MR. ZEIN: Thank you, Your Honor.

THE COURT: -- and where are we?

MR. ZEIN: But --

THE COURT: We're at December '97; right?

MR. ZEIN: Yes -- well, no, no. One second, Your Honor. You see, when I got this, you know, when I was negotiating a multimillion-dollar agreement, my opponents went, and -- I never thought that I have a criminal docket. I never thought I was a criminal to start with. I thought I was doing them a favor by keeping my mouth shut.

THE COURT: This is early on?

MR. ZEIN: Yes, in '91.

THE COURT: Well, wait. In '91, you didn't know you had a criminal docket?

MR. ZEIN: They appeared suddenly, Your Honor, in '91.

THE COURT: I thought you told me you served 30 months in prison.

MR. ZEIN: Your Honor, there is no docket. I was vindicated.

THE COURT: You knew you spent 30 months in prison.

MR. ZEIN: Yes.

THE COURT: Okay.

MR. ZEIN: They were holding me without bail. I wasn't indicted. I wasn't sentenced, nothing. I was

declared innocent, Your Honor, by the court, by the judge. And I gave you that. You see, Your Honor, I have to recreate the whole truth again to remove this forgery, this criminal, heinous forgery.

I have to go to court and eyeball-to-eyeball to the judge, I said, how come I have a criminal record when declared me the only innocent person in your court? He said, it was a moment of emotion. And I'm quoting the record now. I said, no, it is not in a moment of emotion. It is the conscience speaking. So I had to spend seven years stonewalling me.

They come to your court, oh, we haven't made a decision, Your Honor, whether the thing is security or not security. Then why were you making me climb walls to get -- you see, Your Honor, if I come to court without these and to you, Your Honor, and I say, well, I was vindicated, my honorable opponent will stand up in court, in your court, and he'll say, shut up. You were taken to a court of law. You were tried fairly. This is the United States. And you were sentenced to a certain prison term. Shut up and sit down.

THE COURT: You're saying you were never tried?

MR. ZEIN: Your Honor, it was a hearing, and he wanted to see who is what.

THE COURT: You never had a trial?

MR. ZEIN: Not a trial; never a trial. They had a gun to my head to come and plead guilty.

THE COURT: Okay.

MR. ZEIN: Okay. Shall I tell you what happened?

THE COURT: You pled guilty?

MR. ZEIN: No.

THE COURT: Okay.

MR. ZEIN: I did not plead guilty, Your Honor. In the middle -- you see, my family -- you see, I already made the British drop the case. If the British dropped the case, I had no case. But they wouldn't let go, Your Honor. They had my family. I heard the threats from there.

THE COURT: Who had the family?

MR. ZEIN: Your Honor, the thugs who were calling the shots in the American Government. And the thug is still roaming in Washington here. You know, he had a meeting three months ago, you know, the killer of the prime minister of Lebanon, establishing the Committee for Democracy in Lebanon, the most degenerate killer.

THE COURT: Okay. But I'm just trying to -- as I said, I'm just trying to understand the facts that are relevant to this decision that I have to --

MR. ZEIN: Yes, Your Honor. In fact, I go to a judge, Your Honor, to plead guilty.

THE COURT: I understand that.

MR. ZEIN: To plead guilty, and in the middle of the sentence, you know, I was forced --

THE COURT: Well, the sentence comes after --

MR. ZEIN: No, no. Let me give you the -- I'm opening the record.

THE COURT: Give me terms that have meaning, and I want to make sure I understand exactly what --

MR. ZEIN: Exactly. I come to -- I said, okay, I will come to a judge and plead guilty of making a telephone call to a terrorist organization. But you told me to make 10,000 telephone calls. Why don't you put the indictment about 10,000 indictment over that?

They said, no, no. Just say that. So I went to a judge, the same judge, like Your Honor, and he was listening. He said, you are coming to plead guilty to making a telephone conversation? I said, yes, among 10,000 I made on behalf of the Government.

He said, yes, you are not taking any drugs or anything -- sound mind, sound -- I said, yes, yes, yes. And he came to the point, you are coming to plead guilty in my court, because if you were to face a jury, you would lose it. I said, no, Your Honor. I would win it. That's why I'm coming to plead.

What the whole -- it was in camera. Then he said, let me suggest something to you. Why don't you take the

Bradford plea, which I reminded him in '97 again of that. I said, Your Honor, what does that mean? He said, you feel you are 100 percent innocent, you know, but you want to be dispersed with this case?

I said, well -- you know, even my lawyers were sitting on their hands. I mean, what are they going to say? I mean, nothing. I said, okay, fine, Your Honor. But on one condition; I take your explanation. On one condition, make a hearing.

Have you ever heard, Your Honor, of somebody pleading guilty and insisting on a hearing to take the stand? I said, I won't accept your suggestion until you make a hearing. I wasn't in a position to fight more than that for my life, Your Honor. The Government protested. We made a hearing before his decision. I took the stand.

THE COURT: When was this?

MR. ZEIN: In June. This is according to the docket.

THE COURT: June of?

MR. ZEIN: Yes, I mean --

THE COURT: June of what year?

MR. ZEIN: '86 -- no, not in June. In April. Sorry, Your Honor, according to the docket.

THE COURT: Okay. April '88 you take the stand and you have a hearing.

MR. ZEIN: I had a hearing. Every point was considered by the Government, and even the Government refused to ask me questions. The judge was there. They didn't have even one single question to ask me, and they considered every point. I did that, Your Honor, not to give to judge any leeway to hang a sentence over my head.

THE COURT: On what?

MR. ZEIN: The Government considered all its case in front of the judge. Comes the time of decision, Your Honor, which I described to the judge, to the memorandum to the judge, and eyeball-to-eyeball in 1997, I go to his court and you have -- if you want the minutes, I'll give it to you. I'll describe them, and the Court and the District Attorney has put all these, Your Honor, under seal, page by page, including the dockets. Why would --

THE COURT: Well, let me take a step back from '97.

MR. ZEIN: Yes.

THE COURT: I'm trying to understand.

MR. ZEIN: I'm talking '88.

THE COURT: '88.

MR. ZEIN: We come to the Court, Your Honor. Two representatives from the Government are sitting in the back. The judge says, well, I've already met with these people, of course, without either me or my counsel present. And I

would like to advise you, because you know there is so much we have to give, you know, time for the British Government to know that you will be released. So can you wait?

It was a Friday, Your Honor. Can you wait two more days? And this is -- you know, Your Honor, I put so many times my life on the line, they didn't even give me mercy for bail. The FBI and the Government lied to the judge that I represent a danger to the American people. When the people who were supposed to lie, Your Honor, told the truth, they told the judge he saved 50,000 people at one time. Three years --

THE COURT: This is '88?

MR. ZEIN: Yes, three years, 30 months, Your Honor. And to everyone who is sick was put in my cell to break me down. You know how I did, Your Honor?

THE COURT: Work.

MR. ZEIN: I started cleaning the place from 5:00 in the morning till 12:00 at night until the warden couldn't believe it. I went to the kosher kitchen to work from 7:00 till 9:00. I made myself useful in order for the guards not to twist me anymore. 30 months, not mercy.

THE COURT: That's '88?

MR. ZEIN: '88.

THE COURT: And 30 months ended when?

MR. ZEIN: June 12th when I was released on

Monday. He said, let us pretend that I -- let us pretend that I sentenced you, so the papers and the magazines, and whatever it is, do not say, you know -- do not -- I said, okay, Your Honor. And he released me on my own recognizance on Monday.

THE COURT: Okay. So the way it ended up was --

MR. ZEIN: In June.

THE COURT: The way it ended up, in effect, was a plea of guilty, a sentencing --

MR. ZEIN: Not the plea of guilty. I said, I refuse to plead guilty. He said, you can go out on a Bradford. He gave me the wrong explanation, Your Honor. And it is on the record, that's why the records are sealed. I knew. I checked it out.

A Bradford, the one he explained it to me -- the way he explained it to me, Bradford, because you plea that, Bradford, whatever that thing is, you plead, Your Honor, because the defendant will be afraid to lose it in front of a jury.

My answer to the judge, I am pleading for whatever they want me to plead, because I would win if I don't plead in front of a jury. And I gave him so many red flags flashing, and he said in '97, he said if I said that, I shouldn't. I'd be breaking the law. He did break the law.

THE COURT: So why didn't you file suit when you

got out?

MR. ZEIN: Your Honor -- Your Honor, I have a family in Lebanon, and the records are under seal. And if you hit the record, in '88, '89 and 1990, I didn't have any record, none whatsoever. This docket appeared in '91. I mean, if you look at it, you would think the thing happened --

THE COURT: Why is that important for you bringing a suit for the breach of contract that we're talking about?

MR. ZEIN: Your Honor, I don't want to go to a district court violating my civil rights, because I don't want to hurt anybody. I don't want to hurt the judge in New York. I don't want to hurt the Court. I don't want them to start investigating, you know, the thing, because, you see, if this forgery and this honorable man from the Justice Department -- he received it -- you know it is forgery. What have you done about it?

Did you go to the ethical committee in the Justice Department to draw their attention? You know, this man is saying forgery. And what am I saying, Your Honor? The U.S. Government loses case in 1988. U.S. Government wins case in 1991 by fraud, the heinous crime of forgery. I sign it, and I put that if it is not true, take me to court.

THE COURT: Okay. I'm getting back to the contract that you defined, was the contract --

MR. ZEIN: The cause of all things.

THE COURT: The contract provided for the page --

MR. ZEIN: The judge --

THE COURT: Let me --

MR. ZEIN: Yes, I got the question.

THE COURT: The contract provided for six payments.

MR. ZEIN: Yes.

THE COURT: You were told and you knew by November '91 they weren't going to make the payments.

MR. ZEIN: In November '85.

THE COURT: November '85, I'm sorry -- November '85, you knew they weren't going to make the payments.

MR. ZEIN: Yes, but they compromised me, Your Honor, with an organization. Why would by involved with an organization to get a ransom to them? I would have told them to go fly a kite if I wasn't indebted to them.

THE COURT: Okay. So they compromised you with the organization.

MR. ZEIN: Yes. And they --

THE COURT: And you worked out the problem with the organization.

MR. ZEIN: Right. And then they bring me to court, because I paid the debt of the Government. And they come and tell the judge, this man wouldn't have been in your

court if we didn't compromise him.

THE COURT: Okay. And then you're out in April of '88?

MR. ZEIN: Right.

THE COURT: And why you didn't bring suit then?

MR. ZEIN: Your Honor, I'm coming in July '88. August, I went to Lebanon to check on my family.

THE COURT: Right.

MR. ZEIN: I arrived to Kennedy Airport, Your Honor. He takes my green card, and he takes my passport. He finds that I got a visa in '85, and the green card was issued to me by the Government in '82.

And I was told by the Government not to use the green card in my travel in the Middle East, so nobody would consider me an American and I would be part of the hostage escape. So they gave me a visa. But this, according to an immigration law, Your Honor, it's against the law to obtain a visa after you obtain a green card.

THE COURT: Okay. When is this?

MR. ZEIN: July -- August '88.

THE COURT: So why didn't you --

MR. ZEIN: I was back in prison again. So they can remove the green card from me, because I violated immigration law.

THE COURT: So why didn't you bring suit then?

MR. ZEIN: Your Honor, I was not in a position to bring suit because, you see, the thing is it was too strong for me because, you see, if I was forced to plead guilty with threats against my family, why would I march to a judge, Your Honor, instead of saying -- asking me why I didn't bring a suit?

And why didn't you ask me, Your Honor, how come you didn't say to the judge, I'm pleading anything, you know, uncover the charade completely that was taking place. Wouldn't that have been more easy for me? No. I was in danger, and my family was in danger. I had to go along.

The people, even though I did not want to divulge whatever confidence, Your Honor, I was -- if you look at the record, I was kidnapped by the same organization, Your Honor, that same Palestinian Organization, and I didn't give a word that took place in 1973, Your Honor. I was on the verge of death and never divulged any --

THE COURT: Okay. I'm going to ask you again, in 1988 --

MR. ZEIN: I wasn't --

THE COURT: -- why -- precisely, why didn't you bring suit?

MR. ZEIN: Your Honor, why would -- how can I --

THE COURT: Don't answer with a question. Tell me; just tell me why you --

MR. ZEIN: I didn't have a document in my hand to come. I --

THE COURT: You didn't have the documents?

MR. ZEIN: Exactly, Your Honor. I needed --

THE COURT: What documents?

MR. ZEIN: All the documents in the court documents.

THE COURT: But you were in a position --

MR. ZEIN: Who was going to believe me, Your Honor?

THE COURT: -- filed in this court and tell the same story you just told now.

MR. ZEIN: And put my family at risk?

THE COURT: Let me ask you, what is the family at risk?

MR. ZEIN: Your Honor, my brother in Lebanon was stopped for two days to tell him, send your message to your brother in New York to plead guilty, the same thugs that were being paid by this Government. You see, I wasn't only being followed by anti-American thugs; I was being followed by American thugs. I knew too much. And I wouldn't --

THE COURT: You were concerned that if you brought a civil suit here that --

MR. ZEIN: That my family will get hurt.

THE COURT: And is this --

MR. ZEIN: In '88, I had to wait until peace comes to Lebanon in '91 after the agreement in -- and you have a resemblance of a Government. And I know I had the statute of limitations within me. I had time -- within the statute of limitations, Your Honor, I have to pick up the right time.

When I tried to pick up the right time in '91, the hostages are out; there is a Government in Lebanon. I am sure, you know, my family is not going to affect it. I was going to march to court, to come to court here, Your Honor, and put the case in '91.

THE COURT: And so by '91, the concern about your family had ended?

MR. ZEIN: Right.

THE COURT: Okay. And now why didn't you bring suit in '91? Why didn't you bring suit in '91?

MR. ZEIN: This forgery, Your Honor, I had to correct it, because you see --

THE COURT: Why did you have to correct it to bring suit for the breach of contract that we're talking about?

MR. ZEIN: Your Honor, in my understanding, the breach of contract is connected to the case in New York. If they come to you in New York with forged documents that I have been sentenced and I have been indicted and I have been

this and I have been that, I have no case in your court.

THE COURT: Who told you that?

MR. ZEIN: I asked quite a few lawyers.

THE COURT: And they told you that?

MR. ZEIN: They told me --

THE COURT: What were the names of the lawyers that you asked that told you you couldn't bring suit to correct the forgery?

MR. ZEIN: No.

THE COURT: What were the names of the lawyers?

MR. ZEIN: No, because they said you will be breaking the court order of sealing this information, and you will be going -- to go and talk about sealed information without having the information in your hand and it looks to you -- it looks like you have been indited for the related case. So I had to correct the forgery that took place. Your Honor, let's --

THE COURT: Who were the lawyers who told you that?

MR. ZEIN: My own lawyers and --

THE COURT: What are their names?

MR. ZEIN: Mr. Batchheldor.

THE COURT: Anybody else tell you that?

MR. ZEIN: That's the most -- you know, he said he wouldn't, you know --

THE COURT: But who else told you that?

MR. ZEIN: And I asked -- but not in '88 -- I asked in -- you know, in '90.

THE COURT: I'm talking about in '91 when the hostages had been released, when there was a Government in Lebanon, when your family was no longer at risk. And this is what we're getting at, why you didn't bring suit then.

MR. ZEIN: Because --

THE COURT: And your response was you had to correct this error.

MR. ZEIN: No, because -- let me tell you this, Your Honor, and I had other things to consider. And I told you that in the record. If you want me to speak freely, I'll speak.

THE COURT: I want to know why you didn't bring suit.

MR. ZEIN: Your Honor, because it was a year of reaction, and I didn't want to be part of it. And everybody was coming after me. You know, here I'll blurt it out, because all they wanted is to get President Bush. And if there is anybody in the whole world that can give a better testimony for his integrity, it's me. And I refused. I refused in '88, I refused in '91, and I refused in '94 completely. That's why. I didn't want to be part of it.

THE COURT: Okay. Let me make sure --

MR. ZEIN: And I thought if I can get the correct record and come to court here and put it under seal, like I did, that I would not attract attention. But without getting the record first, Your Honor, from the court of law, which they sealed it, I had no chance to come to your Court and put it under seal and give you the complete picture, because they would have loved me to come to your Court in an open court and say what I'm saying today, so they can make me part of the campaign. And I refused.

THE COURT: Why couldn't you come to court with a complaint --

MR. ZEIN: That's what I'm saying.

THE COURT: -- filing the same complaint you filed and essentially say there are documents --

MR. ZEIN: Your Honor --

THE COURT: -- there are documents that are available. And then I would tell you, okay, go get them.

MR. ZEIN: Your Honor, in '91, I said I didn't want to be part of it.

THE COURT: That's what I'm trying to understand, the reason.

MR. ZEIN: I felt --

THE COURT: Excuse me. It could be one reason. It could be another reason. It could be a combination of reasons. Are you telling me that the reason -- the only

reason in '91 that you didn't file suit was because of your concern about Bush?

MR. ZEIN: No. I didn't want to be part of any scandal. Bush --

THE COURT: Because?

MR. ZEIN: Because they were trying to do it.

THE COURT: Who is they?

MR. ZEIN: Your Honor, in closed session, you know -- I mean, I don't want to start naming names.

THE COURT: No, I don't need names. I mean, you did not want to be part of a scandal?

MR. ZEIN: Right.

THE COURT: Okay. So that's the reason you didn't make a suit?

MR. ZEIN: I didn't want to bring the suit.

THE COURT: Because you didn't want to get into a scandal?

MR. ZEIN: I didn't want to be a part of the scandal, Your Honor.

THE COURT: That's the reason?

MR. ZEIN: That's the reason.

THE COURT: Okay. Now, what does this forgery have to do with it if that was the reason?

MR. ZEIN: I have to correct and come to your Court because it is a related case. Your Honor, if you put

the six years in '97 in '91, what does it reach? It reaches '97. Right?

THE COURT: Yes.

MR. ZEIN: When I had the first session in here, '97 in court, after so many years of trying through the lawyers and the stonewalling of the government, I went to court and faced the judge, and I got the recreated record, Your Honor, in September '97. In the file, Your Honor, you will find letters from the government trying to seek some kind of a resolution to this in 1998. All efforts failed, Your Honor, in 1998.

I advised, because they were saying national security, I advised the White House, as you see the letter, that I am opening the case after completely giving up, and there is going to be a settlement outside of the court of law.

THE COURT: So during this time you were trying to settle the case?

MR. ZEIN: Right. And as you saw the letters from the government, between me and the government, sealed. When in 1998 all efforts failed, Your Honor, I came to file the case in your court. My lawyers here in Washington said because of the confidential record and the threat of the government, which I gave you a letter on that, that they want to investigate every lawyer I put to pass through

clearance, in other words, send the FBI after, which scared the daylight of every lawyer I contacted.

They said it is better for you. We advise you, and they are still advising me, and I have one in the Court here, but be your own lawyer, and you speak to the judge. And in April I did that.

THE COURT: In April of?

MR. ZEIN: Ninety-nine. When I have the full truth, I cleaned up the forgery, the fraudulent concealment from the record, and I told the judge I'm not going to make an issue out of it. I will come to your court, Your Honor, as recorded in the C record, and I will put a motion to vacate a conviction that never was, not a conviction that is, a conviction that never was, after I finish from the Court of Claims.

THE COURT: In 1991, when the hostages were out, the concerns about the family were gone, you could have filed the suit here. You could have had all of these witnesses to the contract. You said that they were available.

MR. ZEIN: They are still available right now.

THE COURT: So they were available in '91 if they are available --

MR. ZEIN: I know. I didn't know.

THE COURT: You didn't know -- why?

MR. ZEIN: Because I never talked to them.

THE COURT: You didn't know if they were alive or not?

MR. ZEIN: No, no, no. I didn't want to approach them. I didn't want to compromise them.

THE COURT: You didn't want to compromise them, but you knew --

MR. ZEIN: With the information that I had.

THE COURT: Well, I'm talking about the existence of the contract and the breach of the contract.

MR. ZEIN: I had to get the record, Your Honor.

THE COURT: What record?

MR. ZEIN: The testimony of the government in the trial, Your Honor. I wanted to put my hand on it, Your Honor. How can I bring you a contract without the testimony of the government that it was a contract?

THE COURT: It's easy. You just call them in this courtroom. What makes you think they would say something different in this courtroom than they said in the other courtroom?

MR. ZEIN: No, no. It's not that. I never had any doubt. But when I see such a forgery, such an audacity of changing records, you think I'm going to trust anybody anymore? This is the United States, Your Honor. Nobody goes in the middle of the night, 15 minutes after midnight,

and downloads a computer with such trash. This is the United States, Your Honor. This is the United States.

When I go to your clerk in this Court, Your Honor, he gives me a docket. I already showed you what I have filed in New York. There is no docket. There is not even a shred of any of these documents which they said, it is covered by an order of the court, it is covered by a motion to seal by the district attorney. The only two pages I found in the file in New York, no docket.

I do not exist from existence in 1997 of these two pages, the motion. And the rest of it, which you have exact copy, which the government has already confirmed that they were filed, and there is an order to file them under seal, there is a motion under seal, okay, Your Honor. Order the clerk in New York to show you.

This is 2000. This is year 2000. Your Honor, use your jurisdiction. Order the clerk of the Southern District in New York to send you the agenda, the -- what do you call it? -- the docket and the filing dates of what you have, and see what happens.

THE COURT: If you had filed the case in 1991 and if you're correct as to your arguments that came before that, then I might have been able to do that. But the problem I have now is I can't do that unless I decide I have jurisdiction over the case.

MR. ZEIN: Okay. Then fine.

THE COURT: I don't have jurisdiction over the case unless I find that the statute --

MR. ZEIN: The statute of limitations.

THE COURT: -- limitations has not expired. Right.

MR. ZEIN: Right.

THE COURT: So the question I have before me now is whether the statute of limitations has expired. Now, why don't you tell me -- you have an appendix here filed under breach. Right?

MR. ZEIN: Right.

THE COURT: It's confidential. Okay. Why don't you tell me the pages -- you don't have to go into what it says -- tell me the pages of this confidential document that you believe you needed before you can bring suit here?

MR. ZEIN: Memorandum --

THE COURT: Just take your time.

MR. ZEIN: I know, I know it by heart, Your Honor. I need the memorandum, Your Honor.

THE COURT: Okay.

MR. ZEIN: The sealed memorandum of June 20, 1997, with the following enclosure.

THE COURT: What page is it at?

MR. ZEIN: That page, Your Honor, number 30 to 56.

THE COURT: Of the memorandum.

MR. ZEIN: Yeah.

THE COURT: Okay.

MR. ZEIN: I need the memorandum.

THE COURT: This is the letter that you wrote to the judge.

MR. ZEIN: The memorandum, yes.

THE COURT: You had that.

MR. ZEIN: I beg your pardon?

THE COURT: You had that, didn't you?

MR. ZEIN: No, Your Honor. I need --

THE COURT: You didn't keep a copy?

MR. ZEIN: No. I have a copy.

THE COURT: So you didn't need that?

MR. ZEIN: No, but I had to go to court to face the judge. It took me four years. What's the good of writing something without coming to court and confront the judge with the truth, because I got a forgery?

THE COURT: Wait a minute, I'm trying to make sure I understand. Now, I asked you what did you need to bring suit here.

MR. ZEIN: I needed this information to be confirmed in a court of law, the same court of law --

THE COURT: This is just a letter from you --

MR. ZEIN: Your Honor.

THE COURT: -- with enclosures.

MR. ZEIN: Yeah. I'm telling him what happened. I'm telling him.

THE COURT: Well, but why couldn't you have told the judge in 1991?

MR. ZEIN: I was trying, Your Honor, to get a court case with my lawyers, and they have been stonewalling, preventing the lawyers even to go -- no lawyer is going to go to court, Your Honor, without looking at the proceedings. The proceedings were prevented from -- you see, you have about 10 million letters -- excuse me for the exaggeration, Your Honor -- seeking, you know, to tell, please, Your Honor, letter after letter, letter after letter, please, Your Honor, allow my lawyers to go and view the proceedings and look at the stonewalling.

"No, we cannot allow that lawyer, his lawyers to go and see the proceedings of the case," and I told them I'm opening a case in Washington, D.C. I need my lawyers to see the proceedings in New York; otherwise, nobody is going to represent me. That's why, Your Honor, no lawyer would represent me.

In '91, in a civil case suit, without looking first at the proceedings in the criminal suit in New York, and none was allowed to see the proceedings because of national security, and now the government, what does the

government come and tell you, Your Honor? "We don't care." But why didn't you tell me you don't care and allow my lawyers to look at the proceedings so I can open a case, Your Honor?

You see, the whole hurdle, Your Honor, before coming to your Court, I had to cross the hurdle of getting a lawyer, and no lawyer would take my case against the government of the United States until he gets a look at the court proceedings. Look at it, Your Honor, in your -- in that -- on page 67, letter to the judge, seeking the sealed records of September '94, because all of the time we were going, you know, oral between the lawyers I have with the judge, and he said, "Okay, go with the prosecutors to agree."

Another letter to the judge. Look, from '94, can you imagine how many times, you know, my lawyer went to court and back and forth and back and forth and back and forth, and he comes seeking, you know, in 1996, another letter to the judge seeking the same court records in '97.

THE COURT: What I'm asking you to do --

MR. ZEIN: Yeah.

THE COURT: -- is to go through this document and tell me what you needed --

MR. ZEIN: Your Honor --

THE COURT: -- before you can sue here.

MR. ZEIN: Exactly. I needed --

THE COURT: You needed document number --

MR. ZEIN: Yes. Nobody will take my case until they know what happened in that case. No lawyer. No lawyer.

THE COURT: That's a different point as to what document you needed.

MR. ZEIN: I needed the proceedings of the case completely to be viewed by my lawyers before they open a case. That's why I told you, Your Honor, Mr. Batchelder said, we have to get a copy of the proceedings first to give them to your lawyers in '91.

THE COURT: So you needed a copy of the full proceedings.

MR. ZEIN: Exactly. To give them to my lawyers in order to open a case in '91. And I was prevented by the government with their fraudulent concealment of claiming national security when national security had nothing to do with that, because I wasn't trying to get the proceedings of any secret; I was trying to get the proceedings of the last three days in court -- nothing about -- nothing else.

You see, that's another proof of fraudulent concealment because they are claiming national security -- the government is claiming national security on an issue that does not concern national security. How can I come to

court, Your Honor? In the end you know what happened, Your Honor. I came back to your court after I had given up of hiring a lawyer.

THE COURT: So you filed suit without the proceedings.

MR. ZEIN: No, but I had to have the documents, you see.

THE COURT: Did you have the full proceedings when you filed suit here?

MR. ZEIN: Yes. The minute I got them I came to you.

THE COURT: Anything else, Mr. Zein?

MR. ZEIN: If you want to ask me any question, I'm at your disposal.

THE COURT: Let me hear from the government now.

MR. LANE: Thank you, Your Honor. Your Honor, if I can, I'll be brief. I just wanted to highlight the basis of the government motion, namely that the motion to dismiss should be granted because Mr. Zein had knowledge of the alleged breach of contract in 1985, which was approximately 14 years before he filed suit in this Court. Therefore, his claim is barred under the statute of limitations absent equitable tolling, and Mr. Zein has not established equitable tolling in this case.

THE COURT: Do you agree -- just let me make sure

I understand the characterization -- do you agree -- he characterizes contractors that he will be a guarantor of this agreement.

MR. LANE: Well, Your Honor, for purposes of our motion to dismiss we've taken the allegations in his complaint as true, for purposes of that motion only.

THE COURT: But in '85 you knew that the government had decided not to go forward with the agreement.

MR. LANE: That's correct, Your Honor. We think by the nature of the deal described by Mr. Zein.

THE COURT: He didn't know there would be any consequences from that.

MR. LANE: Well, I think it's clear by the discussion that Mr. Zein provides in his complaint and here this afternoon that what he alleges happened is that in 1985 it was clear that the government was not going to pay and that this organization came to him and told him that they considered him personally liable.

That, as I understand it, had to have happened shortly thereafter because Mr. Zein is now explaining that his criminal arrest in 1986 was related to his discussions between this London ambassador and this same organization to procure these same monies that the organization held him personally liable for, so that certainly this claim in his complaint that they held him personally liable for these

funds had to occur sometime between '85 and 1986.

Before I continue --

THE COURT: Until he works it out, he doesn't know if there are any damages.

MR. ZEIN: Right.

THE COURT: Isn't that correct?

MR. LANE: That's correct, but Mr. Zein has -- well, one, he has alleged a breach, that he knew of the breach. Two, he has alleged that this payment of these monies was resolved in 1986.

So however this works itself out, Your Honor, certainly the issue is resolved in terms of the payment of these monies in 1986, and that was actually -- his communications supposedly are the basis for this criminal proceeding that took place between 1986 and 1988. Based on what Mr. Zein has said today, it may be that he doesn't have a basis to claim breach of contract. That is because these funds were not paid from himself personally and, in fact, these funds were actually paid by someone else, and that part of the contract was resolved.

In fact, what Mr. Zein may be saying is that he has a tort claim, which this Court would not have jurisdiction to consider. But in any event, in trying to bring this motion at this time, what we -- what the government's intent is is to pick an issue where the Court

does not have to delve into some of the nuances of this case and the extensive factual background that Mr. Zein has presented this afternoon, because we are assuming, again, for the purposes of our motion that the allegations are true that there was some sort of contract, and there is no -- the evidence does not establish equitable tolling.

So while there may be other defects that further along in this case we might need to discuss, if it comes to that, we've tried to minimize those for this afternoon.

Let me discuss for a moment -- I'm going to skip the facts alleged by Mr. Zein. I think there has been extensive discussion of those, but let me explain our position on the time frames that Mr. Zein is talking about. If you take the breach of contract in 1985, as he alleges, as Your Honor has correctly pointed out, that brings you to 1991.

Now, there is case law that establishes that incarceration by itself is not a basis for tolling of the statute of limitations, but even assuming that there were some events that occurred between 1985 and 1991, including the fear for his family and issues regarding the hostages in Lebanon -- just putting that aside for the moment, if you start the statute of limitations in 1991, when Mr. Zein has said he had no concerns for his family -- he stated that in the record this afternoon -- that he is ready to go forward,

he said he didn't go forward because he didn't want to cause a scandal. Well, that's not an adequate basis for --

THE COURT: You will have a chance to respond to that.

MR. LANE: -- tolling of the statute of limitations, Your Honor. And starting the statute of limitations in 1991 brings you to 1997. And some of Mr. Zein's claims regarding his inability to come to any court with these issues is belied by his own testimony that they were the subject -- again, I'm assuming that this is true -- of extensive discussion under seal in the Southern District of New York on several occasions, that is, throughout the period of 1986 through 1988. Mr. Zein went ahead -- he's told us this afternoon that he explained his circumstances to the Court at that time and that that transcript is available. Furthermore, he went back to the Southern District of New York in 1997, again explaining his circumstances and bringing up these issues.

His response to the government's motion mentions on numerous occasions, from page 7 through page 12, the testimony and the activities that went on in this New York court proceeding at various times, discussion about him never receiving any money for his services, that his life was on the line, according to U.S. Government testimony. That's on the bottom of page 8 and the top of page 9 of his

response.

And on page 10 and 11, he concedes that when the government raises the issue of, he should have been armed with the facts and he should have proceeded, he says, "Well, I was proceeding in a court of law, addressing the very breach of this contract during the 1986 through 1988 period."

Be that as it may, we think that the explanation that Mr. Zein has provided today does not provide a basis for equitable tolling and, indeed, it confirms that Mr. Zein at the very worst, assuming that there is a basis for some sort of tolling from 1985 through 1991, that he was ready -- that he was able in 1991 to go ahead and bring this matter to court. He could have done exactly as he's done in this suit.

THE COURT: How about his argument that he needed the proceedings? He had to clear up the record. He had to clear up the forgery.

MR. ZEIN: Right.

MR. LANE: Well, Your Honor, the case law is pretty clear that the statute of limitations begins to run when someone has knowledge of the alleged harm that the United States has done to them, and it does not run when you are armed with all of the facts necessary to win your case. And certainly if you look through the appendix that Mr. Zein

has provided, it is predominantly his letters from him that talk about what happened in his case and in his life and in connection with this alleged contract and breach.

Mr. Zein is certainly free to file the suit and then to go ahead and try to get these documents. And in fact, his claim that he wasn't able to get access to these documents is -- I confess I'm a little confused because there seems to be some contradictory representations in his own brief in response. He notes -- if Your Honor would give me just a moment to find the page -- he notes, Your Honor, that his attorneys -- he complains about the conditions put upon his attorneys that they would have to fulfill in order to be able to review the sealed record. And I'm looking at page 19 of his response, and it talks about counsel for Mr. Zein shall be permitted to review, provided that counsel shall obtain an appropriate security clearance from the United States Government.

So that appears to suggest that these records were available for review but, not surprisingly for sealed records, that it was necessary for counsel to get access to those and to take certain steps to review these documents that are apparently classified.

THE COURT: His point on that is he couldn't get anybody who was willing to go through the process. His lawyers wouldn't be willing to go through the process of

getting a security clearance.

MR. LANE: Well, Your Honor, I think that our primary response to these documents is that, one, it's not necessary. They are evidence, they are not -- they don't form the basis of Mr. Zein's claim, that these documents talk about what happened. Mr. Zein was a participant in those proceedings. He certainly knows what happened in those proceedings. He knows what representations were made, so he certainly is armed with the facts of this alleged harm by the United States Government. And according to the deal, this contract that he has alleged, it was impossible for him as a mediator, an intermediary, to not know of the United States being unwilling to pay these monies.

But in any event, Your Honor, the fact that Mr. Zein may not have been able to obtain or did not obtain an attorney who was willing or able somehow to go ahead and get a security clearance is not an adequate basis for the tolling of the statute of limitations. The government is not in that case fraudulently concealing documents. They are documents under seal.

Mr. Zein knows they are under seal. He knows there are conditions for people to look at these documents. He himself has knowledge of what's in these documents, so it's not as if there is a certain extensive record out there regarding what happened -- that he is unaware, that is, say,

he was operating on a different hostage negotiation which was going on, and there was a whole series of facts, to which he was completely unaware, that were under seal, and he was never permitted access to those records under any circumstance. That is not this case, Your Honor.

Therefore, what Mr. Zein has predominantly said is that he needed these records. As I said before, our position is that these records are evidence, Mr. Zein has personal knowledge of all of the things that went on in these criminal proceedings. These criminal proceedings are in a sense sort of a sideline to this case, which goes back to the events of 1985 and 1986, where it is alleged that Mr. Zein acted as an intermediary, had a certain role, a certain agreement with the government.

The government did not fulfill the terms. Mr. Zein, as the intermediary, was held responsible for certain of those terms. He knew of this in 1985 and 1986, and that is the alleged breach of contract, and that is the basis for his case.

The criminal proceeding Mr. Zein has -- it's not within the jurisdiction of this Court. That is something that Mr. Zein actually realizes because he, in fact, went back in 1997 to the Southern District of New York to challenge his conviction, to get the record clean, went back before the same judge and had extensive negotiations, and

there are proceedings in the Southern District of New York from that time. So certainly Mr. Zein understands that that is not -- that he had to go to the Southern District of New York to address those issues and that that is not before this Court.

So while he would have liked to have had these documents, he certainly had knowledge, and that's the test for the statute of limitations, Your Honor. And I think that the test that's in the cases makes it clear that the focus should be on the events of 1985, the alleged events of 1985 and 1986, namely that the cause of action accrues when events necessary to fix the alleged liability of the government have occurred. And generally for a breach of contract, the statute of limitations begins to run at the time of the breach, and that would be 1985. Now, if the full ramifications of that breach were not apparent until, say, sometime in 1986, well, that still puts him far outside the statute of limitations.

THE COURT: He had a realistic fear for his family at the hands of American agents between '86 and '91. Would that be a ground for equitable tolling?

MR. LANE: Your Honor, I confess I have not seen any case law either for -- to support that proposition or contrary to that proposition.

THE COURT: What do you think?

MR. LANE: If the Court would like, I can dig a little deeper and see what I can find. I think it's -- but --

THE COURT: Well, what do you think? What do you think the law should be on that?

MR. LANE: Well, Your Honor, I hate to not directly answer your question, but --

THE COURT: Well, then answer it. That will make it easier.

MR. LANE: Your Honor, I confess I don't know. It raises a new argument that I'm not aware of.

THE COURT: You don't know what you think.

MR. LANE: And I don't know what the proper position should be in the law. But I think it's unnecessary to get into that in this case because, again, Mr. Zein has stated here today that as of 1991 he had no fear for his family and that essentially under any of the scenarios that Mr. Zein has presented -- and he has presented many here today -- he cannot -- he does not survive the statute of limitations. That is, in 1991, if he said -- and he said clearly on the record that he had no fear for his family and that he did not want to go forward at that time because of -- he did not want to be involved in scandal.

MR. ZEIN: And another reason.

THE COURT: Well, Your Honor, that's not a basis

for tolling the statute of limitations. And the only thing that Mr. Zein mentioned today, from 1991 on, again goes to these dockets records, and it's not clear -- well, one thing is clear from these docket records, that they are not necessary for him to bring this case, that he was armed with -- he knew the events necessary regarding the -- that would fix the alleged liability of the United States, that is, the breach of contract and any damages from that breach.

Now, for all of those reasons we think that the government's motion to dismiss on the statute of limitations should be granted. There are certain things that were discussed today that make it clear that there may be other hurdles in this case, such as the fact that Mr. Zein said that he did not pay the monies owed to this organization but that someone else paid them, which would mean that Mr. Zein's suit may more properly be a breach of some sort of duty owed to him in tort, for which this Court doesn't have jurisdiction. For the time being the government is just presenting its motion to dismiss on the statute of limitations and trying to avoid -- trying to keep it simple and on that basis, Your Honor.

THE COURT: Thank you.

MR. LANE: Thank you, Your Honor.

THE COURT: Mr. Zein, now you will have an opportunity to respond.

MR. ZEIN: Your Honor, I'm not a lawyer. I'm a layman with a little bit of common sense. If I come to your Court in '91 before the statute of limitations finishes, and when I see in '91 -- forget about the scandal; forget about my inability to bring another lawyer into your Court before he reviews the proceedings -- when I see a docket, I would like to ask the Defendant, because, you see, Your Honor, they are the sole custodians of these proceedings. And the Defendant took three times to go and check in New York, is this docket true or not? This is your docket.

THE COURT: At this point --

MR. ZEIN: Because you see, Your Honor, if I come to your Court with this in there, so what do I think? I have to think. You have to know my state of mind at that time, in 1991. If somebody goes, has the audacity to put this forgery to the public, it means they have what? They have tampered with the evidence that is under seal.

So if I come to Court to Your Honor and say I had a contract with the government, and somebody comes from the government and says he is a lying criminal, convicted criminal, don't believe him. What do I have? Shouldn't I get the evidence, Your Honor, that has been established in this case first to show you there was a contract before I come and say there was a breach? I'm not a lawyer, Your Honor. You see, I have to get you first to show you there

was a contract.

THE COURT: I understand your point. Unfortunately -- and I'm going to study your argument, and I'm going to study the briefs again, but unfortunately that aspect of common sense is not always the way the law works.

MR. ZEIN: I know. I hope --

THE COURT: The statute of limitations is a provision which bars just claims, which bars appropriate claims, which bars claims that will undo an injustice, but in its wisdom Congress has made a determination that the world is better off to bar these claims under certain circumstances.

MR. ZEIN: Right.

THE COURT: So we're not -- so what we're faced with and what I'm faced with is the law of -- the law controlling the statute of limitations and its application.

MR. ZEIN: Right, Your Honor.

THE COURT: So I can't -- I understand courts do justice, but they do justice in the context of the rules which are imposed upon them.

MR. ZEIN: Yes.

THE COURT: And therefore, in certain circumstances claims don't get heard because they are barred by the statute of limitations. I'm focusing on a very, very narrow issue, and the narrow issue I'm focused on --

MR. ZEIN: Right.

THE COURT: -- is your explanation for what happened, at least since '91. Does it fit within the law?

MR. ZEIN: Right.

THE COURT: Now, if you were under a misperception as to what you would need to bring suit here, then that may bar your claim even if your claim is just and otherwise appropriate.

MR. ZEIN: The misconception, you see, what I want to -- you see, narrow it to the statute of limitations, Your Honor. But in the law, Your Honor, it has two hands. What's the negating factor for the statute of limitations -- fraudulence? Is the government ready to declare in your Court right now orally? And I can bring that motion to dismiss, which mentions the fraudulent concealment. Is the government ready to declare in your Court that there was never fraudulent concealment?

THE COURT: Concealment from whom?

MR. ZEIN: From the truth.

THE COURT: Concealment from the truth?

MR. ZEIN: Right. They are concealing the truth. Forgery is a conceal --

THE COURT: But you knew the truth.

MR. ZEIN: Yes, Your Honor.

THE COURT: So they weren't concealing anything

from you.

MR. ZEIN: No. You see, Your Honor --

THE COURT: Right? Correct?

MR. ZEIN: Yeah, but they didn't have the record up in the open. They are the sole custodian of the record. They put another concealment on it, claiming national security. How do I go on that? You have two concealments in this case, Your Honor: fraudulence; forgery --

THE COURT: Well, arguably, one thing you can do is file suit here in 1991 and leave it up to me to get the documents and leave it up to me --

MR. ZEIN: Your Honor, the documents you will get are forged.

THE COURT: And you can make those allegations.

MR. ZEIN: How? What evidence do I have, Your Honor? Are you going to take my word against the word of the government, Your Honor, when they show you forged documents?

THE COURT: Well, you were asking a judge in New York to do it.

MR. ZEIN: I beg your pardon?

THE COURT: Weren't you asking a judge in New York to take a look at that?

MR. ZEIN: Your Honor.

THE COURT: Yes or no?

MR. ZEIN: I was asking the judge to do what? I didn't understand the question.

THE COURT: What were you asking the judge in New York to do about that forged document?

MR. ZEIN: Until I get to him. It took me six years to get to him, to face him with the forged document.

THE COURT: You wanted to explain it to him.

MR. ZEIN: No, not to explain it to him; to show him that there was forgery.

THE COURT: You wanted to explain to him that it was a forgery.

MR. ZEIN: Yeah. Do you want me to tell you what he told me?

THE COURT: No.

MR. ZEIN: Huh? Do you want me to tell you what he told me?

THE COURT: I don't know what --

MR. ZEIN: No. Would you like to know what the answer? I'm sorry, Your Honor. I'm not very well versed how to address the Court, you know.

THE COURT: I read the -- if it's in the --

MR. ZEIN: Yeah.

THE COURT: -- I read it. I read what you gave me.

MR. ZEIN: Yeah. And I have the minutes, Your

Honor. I quoted the minutes, quoted the minutes of the proceeding.

THE COURT: Whose minutes?

MR. ZEIN: The session that we had.

THE COURT: Who wrote the minutes? Do you mean the transcript?

MR. ZEIN: The transcript, yeah, the court reporter. I said, was --

MR. ZEIN: Was there a conviction? How could there be a conviction?

THE COURT: You didn't give me the transcript, did you?

MR. ZEIN: No. I quoted. Do you want them? I can give you.

THE COURT: Why don't you file a copy after --

MR. ZEIN: But it has to be filed under seal.

THE COURT: That's fine. You can file it in the next few days.

MR. ZEIN: I had to face two fraudulent concealments from the government, Your Honor, their fraudulent claim that this is national security; the sky is falling. They spooked the court and everybody in it. And I wasn't thinking. I wasn't trying to get any proceeding that had any national secret in it, Your Honor. I was all trying to get the proceeding of what happened in the court.

Was I sentenced, or was I not sentenced that day? That's all I was trying to get. And where is it, Your Honor? Now, when somebody comes to court, Your Honor, to see the record so they can open a case against the government for concealing it in New York, to show forgery, the whole record disappears from the clerk, Your Honor, from the clerk's office.

I was dealing with two fraudulent concealments, Your Honor. When I thought -- and this is only, I said, you know, the law. The law, Your Honor, the statute of limitations is negated by fraudulent concealment. Forgery is the worst fraudulent concealment anybody could make.

I know, Your Honor, I have a right to go and drag them to jail for violating my civil rights, according to the 1983 Civil Rights Act, which has no statute of limitations, and I can put them in jail, and I can put everybody who touched the case in the Justice Department in this because they didn't go to the ethics committee or whatever they have in there to correct this forgery. Even the dismissal motion, Your Honor, is an obstruction of justice, in my opinion, because they are covering a forgery, fraudulently concealing it.

The statute of limitations, yes. The negating factor, fraudulent concealment. They have fraudulently concealed the information, Your Honor, by putting it under

seal. And if I didn't correct it and I come to Your Honor's Court, and they would have provided you with forgery, Your Honor, and I had no chance in heck to contest it.

So I was forced, Your Honor, to recreate a genuine record in a court of law where it happened so I can come back with my evidence after they played and tampered with the evidence. Can the government, Your Honor, if they are claiming statute of limitations -- I would like an oral answer, Your Honor, in this argument, and I yield to my honorable opponent. Can he come and claim -- you see, he comes into this motion, and he says only fraudulent concealment is possible in this manner. Can he claim in your Court orally that there was never any fraudulent concealment pertaining to the evidence in this case? Can they do that, Your Honor?

THE COURT: Well, at this point to reach the statute-of-limitations issue, I don't know whether that's necessary or not, to make a determination like that.

MR. ZEIN: Your Honor, what is the negating factor for the statute of limitations, as he is saying, fraudulent concealment?

THE COURT: It wasn't fraudulently concealed from you. You admitted that.

MR. ZEIN: Yeah, but --

THE COURT: So you had the information.

MR. ZEIN: Orally. The information is under seal, Your Honor, and I don't know if that under-seal information is true or not because the docket is a forgery. You see, what is the docket except --

THE COURT: You know what happened to you.

MR. ZEIN: -- describe it. Your Honor, but they are telling the world what happened. It's a public record.

THE COURT: And I can understand why if it's a public record --

MR. ZEIN: Yeah.

THE COURT: -- and it's a forgery, it's very upsetting. It undermines the system of justice. I understand all of those arguments, but as I tried to tell you early on --

MR. ZEIN: Uh-huh.

THE COURT: -- this Court in this particular case --

MR. ZEIN: Uh-huh.

THE COURT: -- has a very, very narrow focus. If you did everything you said you did, and it's all exactly as you allege in your various documents, then certainly the United States owes you a debt of thanks. There is no doubt about that. But -- and in a sense, justice would see that debt paid.

But this Court and courts are courts with defined

jurisdiction, and the issue I have before me is not whether you did that, is not whether all of these allegations are true or not, but it's much narrower. It's simply an application of the statute-of-limitations precedent. And I understand your argument, and I'm going to go back and I'm going to read the law, and I'm going to make a determination about whether or not this fraudulent concealment which you allege is sufficient under the law to equitably toll the running of the statute of limitations.

MR. ZEIN: Do I understand, Your Honor, that the fraudulent concealment means it was not concealed to me? Right?

THE COURT: That's what the government is alleging. Is that correct?

MR. ZEIN: It wasn't concealed to me.

THE COURT: Government counsel, is that what you're saying?

MR. LANE: Yes, Your Honor, at least regarding the events of 1985 and 1986. And regarding the criminal events as well.

MR. ZEIN: Right. It wasn't concealed to me, but making them under seal, they made them concealed to everybody, including my lawyers. Right? How can I come to court, Your Honor?

THE COURT: You can file the same complaint you

filed in 19 --

MR. ZEIN: And they would have brought -- oh, I see.

THE COURT: They can bring anything they want, but what happens once a lawsuit is filed, if it's proper jurisdiction, you get an opportunity to take discovery. You get an opportunity to bring in all of the witnesses that may have appeared before, you know, the court in New York. You get an opportunity to show what happened.

MR. ZEIN: Your Honor, because you see, to me, unless I deal with this fraud, fraudulent concealment first, so I can bring Your Honor the contract --

THE COURT: I understand.

MR. ZEIN: Yeah.

THE COURT: That makes sense, but it may not be --

MR. ZEIN: -- the law.

THE COURT: -- what the law provides.

MR. ZEIN: Okay. Because you see, Your Honor, in either case I just put everything -- and I didn't want to misrepresent in any way, even if it works against me, but that's the truth you heard today.

THE COURT: No. I understand what you are saying, and I think you understand what I'm saying, and that it's -- your approach, I can understand the common sense behind it, but I have to make a determination about whether or not the

law permits you the opportunity to go ahead and clear up the questions of the confidentiality before you bring suit.

MR. ZEIN: No, and put it back to genuine truth, because, Your Honor, no lawyer would have touched me with a ten-foot pole, and my case would have been very frivolous, you know, if I come to court with nothing in my hand except my oral opinion.

THE COURT: I understand your argument. Okay. Thank you. Anything else from the government?

MR. LANE: Yes, Your Honor. I just had --

THE COURT: You didn't want to answer my question from before, did you?

MR. LANE: I apologize, Your Honor. I think I'm somewhat at sea in terms of addressing that issue, although --

THE COURT: That's fine. That's fine.

MR. LANE: -- I can understand the Court's desire to look into that.

I just wanted to make two quick points about -- just speaking directly to fraudulent concealment. It's the burden of the Plaintiff, because it's jurisdictional, to prove fraudulent concealment, and here he relies on two things. One is this forged record that he is talking about on page 56 of this thing filed in May. And as to that, this is a document that if it conceals anything, it conceals

information about his criminal case and whether he was convicted or not convicted. It doesn't conceal anything regarding the breach of contract that allegedly occurred, so we're somewhat mixing apples and oranges.

Furthermore, this is a document created by the clerk's office in the Southern District of New York. This is not a document created by the Department of Defense, so to --

THE COURT: He is not sure who it is created by.

MR. LANE: I can certainly --

THE COURT: It purports to be created by the clerk.

MR. LANE: I can understand from Mr. Zein's perspective that he is not going to separate out the various government entities, and I understand that.

THE COURT: No. He thinks somebody else may have done it.

MR. LANE: But when we're talking about meeting his burden to prove fraudulent concealment, we're looking at a document that appears to be created by the clerk's office in the Southern District of New York --

THE COURT: Wait. You're moving for a motion to dismiss.

MR. LANE: That's correct, Your Honor.

THE COURT: He hasn't had an opportunity to

discover who did that.

MR. LANE: I can see Your Honor's point that that would be a premature injury.

The other point that he relies upon is things placed under seal, and I think just as a matter of law, that it would be impossible to find fraudulent concealment of a proceeding that someone was personally involved with and had knowledge of simply by virtue of the fact that the proceedings were placed under seal.

That's not an uncommon event, and in all sealed cases there are requirements for access for materials, and there has been no evidence that shows that Mr. Zein or his lawyers were prohibited from accessing materials, rather, that there were conditions placed upon that access. Thank you, Your Honor.

THE COURT: His argument is the effect of that was to prevent him from getting a lawyer.

MR. ZEIN: Your Honor --

MR. LANE: I understand that, Your Honor, but I think the point that you made is well taken, namely that there was nothing to prevent Mr. Zein from filing the same complaint he filed in 1999 on his own and then taking matters from there. Thank you.

THE COURT: Mr. Zein?

MR. ZEIN: Your Honor, when I see the docket is a

forgery, what else do I have to think, that the proceeding has become a forgery? And that's what put the burden on me to put diligent work to bring to this Court the truth. Your Honor, I'm not talking about the sealing of the docket by themselves, but the minute I saw the forgery of the docket I took it for granted, absolutely like the truth, that whoever did it had the guts to go and change the proceedings.

THE COURT: Okay. I understand that.

MR. ZEIN: And that's the fraudulent concealment, and in that proceedings, Your Honor, I had the contract proven. I had to bring it to your Court to show you that I had a contract. And what made -- lost all of this time is the government. I told you, Your Honor, in my -- you know, I gave you a parable. It's like, you know, the one who went and killed his mother, and he went to court seeking clemency because he is an orphan.

That's exactly what they are doing. They go and change the record, stonewall so the time, the statute of limitations passes by, and then they come innocently, you know, and claim in Your Honor's Court, "Oh, Your Honor, time passed. That's it." But who did it?

I wasted time, or they wasted the time so that they can come to claim in your Court that the statute of limitations -- and they did it intentionally, Your Honor, so the statute of limitations passes by, to prevent me from

coming to this Court, intentionally. They were not protecting national security; they were protecting their hides.

THE COURT: Okay. Now, are you going to get me a copy of the minutes --

MR. ZEIN: Yes, sir.

THE COURT: -- the transcripts, and file them under seal? Try to do it by the end of next week.

MR. ZEIN: Right, sir.

THE COURT: Okay?

MR. ZEIN: I will send it to your chamber, Your Honor, rather than to the clerk, and if they want to seal it, they can send you the motion.

THE COURT: No. Send it to the clerk.

MR. ZEIN: To the clerk?

THE COURT: Filing under seal.

MR. ZEIN: Under seal. Shall I put the motion to seal it myself, or -- how do --

THE COURT: I'll put out an order that says you should file it under seal.

MR. ZEIN: Okay, Your Honor.

THE COURT: I'll put out an order this week or next week. Okay? Thank you all very much.

ALL: Thank you, Your Honor.

THE COURT: The motion is submitted.

(Whereupon, at 4:05 p.m., the hearing was adjourned.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 99-244C

CASE TITLE: Mustafa M. Zein V. U.S.

HEARING DATE: January 13, 2000

LOCATION: Washington, DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: January 13, 2000

Sharon Cook

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N. W.

Washington, D. C. 20005-4018