UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

UNITED STATES OF AMERICA

v. 88 Cr. 99 (JES)

MOHAMMED MUSTAPHA ZEIN,

Defendant.

-----------------------------------x

New York, N. Y.
June 2, 1988
6:05 p.m.

BEFORE:

HON. JOHN E. SPRIZZO,

District Judge

APPEARANCES:

RUDOLPH W. GIULIANI, Esq.
United States Attorney for the
Southern District of New York
BY: HERVE GOURAIGE, Esq.
Assistant United States Attorney

ARTHUR J. VIVIANI, Esq.
HARRY C. BATCHELDER, Esq.
Attorneys for Defendant

S E A L E D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA

v. 88 Cr. 99 (JES)

MOHAMMED MUSTAPHA ZEIN,

Defendant.

------------------------------x

New York, N. Y.
June 2, 1988
6:05 p.m.

BEFORE:

HON. JOHN E. SPRIZZO,

District Judge

APPEARANCES:

RUDOLPH W. GIULIANI, Esq.
United States Attorney for the
Southern District of New York
BY: HERVE GOURAIGE, Esq.
Assistant United States Attorney

ARTHUR J. VIVIANI, Esq.
HARRY C. BATCHELDER, Esq.
Attorneys for Defendant

S E A L E D

THE COURT: In re Zein.

What is the problem now?

MR. VIVIANI: It is not a great big problem, if I can express it, your Honor. We were last here on the 16th. The Court raised two issues. One was whether or not the defendant was in the transaction for his own gain. I thought we kind of defused it and I think our sentencing memorandum speaks to that. The second issue was the false exculpatory statements and whether or not a hearing is going to be necessary for that.

The government is taking the position that they think the only relevant witness to such a hearing is an FBI agent by the name of Handley. We take the position that if there is going to be a hearing, we would like two of the CIA employees up here.

THE COURT: Were they here at the meeting?

MR. VIVIANI: Yes, they were.

MR. BATCHELDER: Yes, they were.

MR. GOURAIGE: Judge, I guess I can state the government's position. We don't take the position that the only relevant witness is Jim Handley, the FBI agent. That is the only witness we would call. The two CIA agents spoke with Mustapha Zein in a separate room by themselves before the meeting, and only one of them sat in the meeting during which Mustapha Zein made these false statements.

THE COURT: You are saying to the extent that their testimony would duplicate that of the agent, it is cumulative?

MR. GOURAIGE: That's right.

THE COURT: Unless they have a basis to believe they will contradict Handley's testimony.

MR. GOURAIGE: That's right. The government doesn't need to call them just because they believe that his testimony will somehow contradict the testimony of Jim Handley and will corroborate Mustapha Zein. I don't think so.

MR. BATCHELDER: Your Honor, can we approach your Honor?

THE COURT: Why? There is nobody here.

MR. VIVIANI: Judge, can I just put everything in context so you understand what we are talking about? The defendant was arrested on a Saturday, January 18, 1986. He appears before the magistrate on a Tuesday, January 21. Monday was a holiday. A meeting is held, I am told, probably that Friday, which is roughly the 24th. Zein is brought over here and, it is my understanding, is waiting in the third floor lockup for approximately twelve hours and refuses to come up, at which point Mr. Batchelder, who is representing him, sends him a note on his card saying, look, it is important you come up to listen to what the

government has to say.

He goes over to the U.S. Attorney's Office when two individuals, Marino and Marrero, are up from the CIA. What is said in the room, what Zein says to Marino and Marrero, concerning the kidnapping, I think is important. It is my understanding that he tells both of them that, "Yes, I was in London, and I am not going to say anything more until you guys promise me that you tell the U.S. Attorney's Office why I was in this thing in the first place."

There is then apparently a shuttling back and forth in which Mr. Gouraige, Mr. Batchelder --

THE COURT: In any event, if you want these witnesses here, I am not going to say they should not be here.

MR. VIVIANI: The question I have is how do I get them? I don't know where Marrero is. He is retired.

MR. GOURAIGE: Marrero is no longer employed by the CIA. I personally don't know where he is. I assume the agency does. But Marino is actively involved and I think may be outside of the country.

THE COURT: It doesn't bother me. I will adjourn the hearing. It doesn't make any difference to me.

MR. GOURAIGE: That is one thing that the government wanted to ask, your Honor, is postponement of

the June 6 date. We can't make that.

THE COURT: If they want these witnesses here, and they can't be here on June 6, I have no alternative but to adjourn the hearing.

MR. GOURAIGE: My position now, and this is just what I am reporting to the Court based on what the CIA's position is, is that if they want the witnesses, then the CIA has declined to produce them. If they want to go out and subpoena these witnesses, then they can subpoena them and then the agency would have to do whatever they think is appropriate in response to that.

THE COURT: But I am saying that if you are telling me now the agency will not produce the witnesses, then there is no reason to adjourn the hearing.

MR. GOURAIGE: There is another reason apart from that one.

THE COURT: You will just have to proceed at your peril. If they say these witnesses would help them and you say you won't produce them, then I may be forced to resolve the issue against you.

MR. GOURAIGE: I am prepared to produce affidavits from these individuals that would, I think, support the government's position. As I said, I was not in the meeting where --

THE COURT: On a Fatico hearing I can take an

wc

Sealed



affidavit.

MR. GOURAIGE: That's correct.

THE COURT: But obviously that goes to weight. And if I have an affidavit that is not cross-examined, you know, I may not give it the same weight I am going to give live testimony that is cross-examined. Either way you may face a resolution of that issue against you if for one reason or another the government chooses not to make them available. I have to have deal with what I can deal with.

MR. GOURAIGE: It is not a problem of choosing not to make them available, your Honor. I mean, I think we can do this, because --

THE COURT: If his claim is going to be, yes, I said these false things to Handley at that meeting, but everybody knew I was going to say those false things to him at that meeting because I discussed with the CIA people the true story and I said I am not going to tell the true story until I get certain assurances, then that wipes out the effect of the false statement if the government knew the statement was false.

MR. VIVIANI: Let's carry it from there on, Judge. What happens --

MR. GOURAIGE: No, no. I think we have to separate. When you say the government, Judge, we certainly, that is --

THE COURT: But it is one government.

MR. GOURAIGE: The U.S. Attorney's Office was never told at any point --

THE COURT: I know that. But if you were prosecuting somebody for making a false statement, and the person was a CIA operative, let's assume -- and take even the Secretary of the Treasury, or wherever that fellow was, Abrams, who felt free to conceal things from the Congress because he thought this was what his public duty required -- there may be situations when it is important for one person who is working with one agency in the government not to disclose facts to another agency of the government. That is what the Iran scam seemed to be all about. Some people in government said they were not going to tell the Congress because this is a matter of executive privilege.

If you have a false-statement prosecution and the charge is that he lied to the FBI, and the defense is going to be that we lied to the FBI but the CIA knew we were going to lie to the FBI because we told them we had to lie to the FBI because of our CIA connection, you could not sustain a false-statement charge to the FBI on that theory, because the truth was disclosed to one agent of the government even if a lie was told to another agent of the government. It is one government. I don't think you could ever argue to any court with any degree of logic that you

could prosecute a guy for lying to one agency while another agency knew he was going to lie and encouraged him in that course. I don't think the entrapment or whatever it would be, it would ever fly.

If we are dealing with that kind of situation here, where the government is making an argument that it is an aggravating, which I thought you were arguing, circumstance on sentencing that he did not come clean with the government when the other part of the government knew what the facts are were and even knew that he wasn't going to come clean with the government because of his own reasons, I don't think I could weigh that very heavily against him on sentencing.

MR. GOURAIGE: I think that is not what we have here, Judge. That is why I offered to submit affidavits from these individuals, because I believe that they will say that at no time did Mustapha Zein tell them --

THE COURT: Maybe the logical way to proceed is to take Zein's testimony first. Let's see what he says.

MR. GOURAIGE: I think that is probably the logical way to proceed. If Zein is willing to take the stand and testify that he told these two agents that he was going to lie to us and they said, "Fine, you go ahead and do it" --

MR. VIVIANI: I said he said to them, "I was in

London." May I put this in perspective, Judge?

We have the January 24 meeting, at which they claim he lied. After the January 24 meeting, about a week thereafter, Mr. Gouraige and FBI Agent Handley bring Zein over to the U.S. Attorney's Office, again to speak to him. Mr. Batchelder is not present. He refuses to meet with them. His position is clear. "I will tell you everything that happened once the CIA tells this government why I got into this in the first place."

On February 26, 1986, within a month, a little bit more than a month of his arrest --

THE COURT: But he could have been silent on January 24, too. That is the government's argument.

MR. VIVIANI: I understand. But then on the 26th what next happens is, he is assured by Marrero, "We have told everything to the government. You can now explain the entire episode." Of course, the government, if Mr. Gouraige would take the stand, didn't know the entire story, because it only came out in dribs and drabs over a few-year period. On the 26th he is completely debriefed by two CIA people who are tape recording him while Agent Handley and Assistant U.S. Attorney Gouraige are taking notes. In that conversation he tells them everything, everything, and his complete role in everything.

THE COURT: Which is when?

MR. BATCHELDER: The 26th of February.

MR. VIVIANI: February.

THE COURT: Which is a month later.

MR. BATCHELDER: Yes, a month later.

MR. VIVIANI: After he is assured by the CIA that he would bring to the government's attention the reason he is in this in the first place. He is given that assurance. So I say to myself, what are we arguing about, false exculpatory statements?

THE COURT: I thought there was a dispute as to whether or not he made false statements on January 24.

MR. GOURAIGE: There is no question he made false statements.

MR. VIVIANI: The question then is, was he in London at the time and participated --

MR. GOURAIGE: There is more than that.

MR. VIVIANI: That is a portion of it.

MR. GOURAIGE: Judge, on January 24 we confronted Mustapha Zein. We knew that he had made the two phone calls to the victim, we knew that he was in London, we knew that he knew the victim, we knew that he had the telephone number of the victim, because we had recovered a piece of paper from his apartment. We asked him pointblank, "Were you in London on that date?" He said no, he had been in a hotel and he left at 9:30.

"Did you make the phone calls?" He said no.

"Do you know the victim?" No, never met him, never saw him.

"Do you know the victim's telephone numbers?"

"No, absolutely not. I was just a negotiator for the ambassador to release the victim."

And we went around about this for two hours. He repeatedly told us these false statements, until Howard Wilson said to him, "Mr. Zein, I don't believe you. In fact, I know that you are not telling me the truth. And here is a piece of document that I want you to look at." He looks at the piece of document and he says, "Where did you get it from?" And we said, "Well it doesn't matter where we got it."

THE COURT: Is there any dispute about those facts?

MR. BATCHELDER: Yes, there is, your Honor. Because I was his attorney and I told him and what the government doesn't realize I told him, and I will take the stand and say this, that he was to deny any involvement whatsoever.

THE COURT: I understand that. But that is not what I am asking. What I am asking is, does he deny that he told false information to the government on that first meeting? He may have done it under your direction.

MR. BATCHELDER: I told him to deny involvement in it, which is what he did.

THE COURT: You may be in real difficulty if you testify to that. It makes you an aider and abettor, you know.

MR. BATCHELDER: No, because what we took, your Honor, was we took the position in that initial meeting, I took the position in that initial meeting, until I knew what was going on with the CIA.

THE COURT: Then you tell him to say nothing.

MR. BATCHELDER: Exactly. I did, your Honor. I then opened him up and said, "Look, go in and talk with the assistant general counsel of the CIA and come back." And they went back and forth.

THE COURT: No, no, but on the first meeting your position should have been, and your client's position should have been, that until we clarify this whole question with the CIA, he doesn't say anything.

MR. VIVIANI: Don't admit it.

THE COURT: It is one thing not to admit by --

MR. BATCHELDER: I understand what you are saying.

THE COURT: Wait a minute. I am telling you, it is one thing to go into an interview and say, we are not going to say anything or admit anything. It is another

thing to give affirmatively false testimony. You are telling me he gave false answers at your direction. Then I tell you quite frankly you are going to get yourself into a lot of trouble by doing that.

MR. BATCHELDER: Told him not to admit anything, your Honor. Not to admit his involvement.

THE COURT: Weren't you there during the interview?

MR. BATCHELDER: I was there during parts of the interview. I went back out with him and back and forth.

THE COURT: If you want to take the responsibility for his lies, you can. But my question is, is there any question that he told a lie?

MR. VIVIANI: I don't know the answer to that. I wasn't present.

THE COURT: I thought that is what we were going to have the hearing about.

MR. VIVIANI: Let me focus this. This is my difficulty in understanding exactly what he is saying, because there had been so many interviews with Mr. Zein.

It is my understanding he comes up to the room, he stays in the room for a very brief period of time, wants to leave, and is taken out with the two CIA agents and remains separate and apart from Mr. Wilson's office.

THE COURT: This is on January 24?

MR. BATCHELDER: Yes, it is, sir.

MR. VIVIANI: Where he stays for a majority of the time, during which period of time he is told by Marrero, "What we are trying to do is to work a deal for you and what we are trying to do is to get bail for you." And Marrero would shuttle back between his room --

THE COURT: Then I have to hear Zein's testimony first. Then I will decide whether or not he is lying.

MR. VIVIANI: The second thing that happens is, he comes into the room after it is all over, Zein comes into the room. My understanding next is that Mr. Wilson says, "OK, you're a terrorist, you're a kidnapper, you stole money, and the only deal we are going to make for you is, you are going to return this money back." And his response is, "I am not a kidnapper; I am a rescuer of people." He is saying, "OK, you're calling me a kidnapper; I actually saved this man's life."

THE COURT: I have heard enough to know --

MR. VIVIANI: I don't know if this is --

THE COURT: It is now 6:15, so I am not going to sit here much longer. What I am saying is that I don't know whether or not the CIA agent lied or the affidavit is even relevant until I hear the testimony of what happened on January 24. I am prepared to do that, maybe not on June 6, but I am prepared to do it on June 9. June 6 is not a

good day for me.

MR. VIVIANI: The 9th I have to be in Albany, your Honor.

THE COURT: Give me another date.

MR. VIVIANI: I could do it that Friday, the 10th.

THE COURT: That is not a good day for me. That is a motion date. I can probably do it the following week. Then I will decide whether I need any more witnesses. Let me hear the evidence.

MR. BATCHELDER: I have to pick a jury, your Honor, I think on the 13th in New Hampshire. I know I have to pick the jury.

THE COURT: June 10 is not too bad. I have five arguments on, but nothing really on in the afternoon. How long will this hearing take?

MR. VIVIANI: If you just want Zein's testimony?

THE COURT: No, I will take their testimony.

MR. GOURAIGE: Zein and Handley. Handley is just one meeting and it is not going to be very long.

MR. VIVIANI: Will they make available the 302's, Judge?

MR. GOURAIGE: Sure. We will give you all the 302's relating to that meeting.

THE COURT: We could start it on the 10th. If

we don't start it --

MR. GOURAIGE: I think we can finish.

THE COURT: We could start on the 10th at 4 o'clock and I will give you an hour between 4 and 5 and kick the sentencing I have over until 5.

MR. GOURAIGE: That is fine.

MR. VIVIANI: Yes.

MR. BATCHELDER: Your Honor, we submitted a sentencing memorandum. We don't believe the government is going to respond to that. Are there any other areas that you would like us to focus on?

THE COURT: I haven't read it.

MR. BATCHELDER: Because if there are, we would appreciate it.

THE COURT: Another reason I want to adjourn the hearing anyway that I have not read your memorandum. I probably will not get a chance to read it, given my other Part 1 commitments, before next Friday anyway.

MR. VIVIANI: One other fact, your Honor, and I think it is kind of important. The government is telling us they are now going to the bank where the $3 million check arrived in New York City. I had thought that they had done that two years ago. I am going to take the position, if they do not introduce any evidence from that bank, then I would like your Honor to take that as a lack

of evidence and as a strong presumption that our position, as we reported in our sentencing memorandum is the accurate one.

THE COURT: In any event, I am not going to rush into the sentencing. We have plenty of time, plenty of adjournments. If I think I need more time I will take it. One of the reasons I wasn't anxious to proceed on June 6 is that I am in the middle of a trial, Tuesday is motion day in Part 1, and I have two or three rather lengthy motions which we don't normally get in Part 1. I will be reviewing those on Monday night and probably tomorrow night and I won't have a chance to read your memorandum before next Tuesday night. It seems to me improvident to proceed quickly when we don't have to. There is enough time here. He is already in jail. Whatever time he is doing now he will get credit for anyway. So there is no point to rush. I will take as much time as I think I need.

- - -