wc 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA

v. 88 Cr. 99 (JES)

MOHAMMED MUSTAPHA ZEIN,

Defendant.

------------------------------------x

New York, N. Y.
June 10, 1988
3:10 p.m.

BEFORE:

HON. JOHN E. SPRIZZO,

District Judge

APPEARANCES:

RUDOLPH W. GIULIANI, Esq.
United States Attorney for the
Southern District of New York
BY: HERVE GOURAIGE, Esq.
Assistant United States Attorney

ARTHUR J. VIVIANI, Esq.
HARRY C. BATCHELDER, Esq.
Attorneys for Defendant

S E A L E D

wc



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

UNITED STATES OF AMERICA

v. 88 Cr. 99 (JES)

MOHAMMED MUSTAPHA ZEIN,

Defendant.

-----------------------------------x

New York, N. Y.
June 10, 1988
3:10 p.m.

BEFORE:

HON. JOHN E. SPRIZZO,

District Judge

APPEARANCES:

RUDOLPH W. GIULIANI, Esq.
United States Attorney for the
Southern District of New York
BY: HERVE GOURAIGE, Esq.
Assistant United States Attorney

ARTHUR J. VIVIANI, Esq.
HARRY C. BATCHELDER, Esq.
Attorneys for Defendant

S E A L E D

wc



THE COURT: Shall we close the courtroom?

MR. GOURAIGE: Yes, Judge.

Judge, the government is ready to proceed. I have Jim Handley here, who is the FBI agent who arrested Mr. Zein.

THE COURT: I am only interested in a very narrow hearing, right?

MR. GOURAIGE: A narrow hearing as to what happened from January 18, 1986, to early February, that is, what Mr. Zein told the U.S. Attorney's Office and the FBI about how he got involved in this kidnapping.

THE COURT: Put him on and we will see what he says.

J A M E S L. H A N D L E Y, called as a witness by the government, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GOURAIGE:

Q. Mr. Handley, what is your occupation?

A. I am an FBI agent.

Q. How long have you been an FBI agent?

A. Eighteen years.

Q. What specifically are your responsibilities?

A. Currently I am the supervisor of a squad that

handles various criminal violations in Brooklyn-Queens.

Q. On January 18, 1986, did you arrest Mustapha Zein?

A. Yes, sir, I did.

Q. Where did you arrest him?

A. In Manhattan at his apartment at Fifth Avenue and 35th Street.

Q. What did you arrest him for?

A. We arrested him for kidnapping.

Q. Who was kidnapped?

A. A gentleman by the name of Sadiq Al-Tajar was kidnapped in London on, I believe, January 7.

Q. Was it January 6?

A. January 6.

THE COURT: This is 1987?

THE WITNESS: 1986, your Honor, excuse me.

Q. 1986.

A. 1986.

Q. Is the person you referred to, the brother of the Arab Emirates ambassador to England?

A. Yes, sir.

Q. After you arrested Mr. Zein, did you contact Scotland Yard?

A. Yes, sir.

Q. Did they send two detectives over that weekend?

WC



A. Yes, sir. The arrest was made on a Saturday evening and they flew in Sunday evening.

Q. Did you have occasion to speak with Mr. Zein on January 21, 1986?

A. Yes, sir.

Q. Will you tell us what he told you about how he got involved in this kidnapping?

A. Mr. Zein said that he was contacted by a group from the Middle East and instructed that he would assist in this kidnapping, which was to take place in London. This happened, he said, in late November and December of '85.

Q. Did he say to you that he was a negotiator in this kidnapping?

A. Yes. He said initially he was against the plan, but when he talked to the victim's brother, the victim's brother pleaded with him to act as a negotiator, as a go-between between the kidnappers and himself.

Q. Do you remember on January 18, when you arrested him, his telling you that he was not in London on January 6, 1986?

A. Yes, sir.

Q. And did he tell you that his last trip to London had been two weeks prior to that date?

A. Yes, sir.

Q. Did he also tell you -- this is on January 18, now, when you arrested him -- did he also tell you that Agent Marino of the CIA was aware of this kidnapping?

A. Yes, sir.

Q. After January 21, but before February 13, did you participate in several meetings at the United States Attorney's Office with Mr. Zein, his counsel Mr. Batchelder, and Assistant United States Attorneys?

A. Yes, sir.

MR. VIVIANI: Could we fix a date where possible?

Q. Well, if you remember. Do you remember?

A. I could refresh my memory from notes, but there are meetings that I attended that I have no notes of. But it was between January 22 and February 13. There were a number of meetings in both your office and in Mr. Howard Wilson's office.

Q. Do you remember how many meetings there were?

A. No.

Q. Were there more than two?

A. Oh, yes.

Q. Less than five?

A. I would say five.

Q. Do you remember Mr. Wilson asking Mr. Zein about his involvement in the kidnapping?

A. Yes, I do.

Q. Was he asked whether he knew the victim of the kidnapping?

A. Yes. He said he did not.

Q. Was he asked whether he had been in London on the date of the kidnapping?

A. Yes.

Q. And what did he say?

A. He said he was not.

Q. Was he asked whether he had made telephone calls to the victim of the kidnapping on the date of the kidnapping?

A. Yes.

Q. And what did he say?

A. He said he did not.

Q. After January 7, but before January 18, the date you arrested Mr. Zein, did you have occasion to execute a search warrant at Mr. Zein's apartment?

A. Yes.

Q. During the course of the execution of that search warrant did you recover a piece of paper in the waste-paper basket?

A. We recovered a number of pieces of paper in the trashcan that had been torn, in other words, there were six pieces instead of one, to make a point. There were more than that, but --

Q. Did you put those six pieces together?

A. Yes, sir.

Q. And what was the information on that piece of paper?

A. There were two addresses and a couple of phone numbers and other numbers, but the address, one of the addresses written on the piece of paper was the address at which the kidnapping took place and the phone number under that was the phone number at the office of the victim.

Q. Were you present when Mr. Wilson showed that piece of paper to Mr. Zein at one of the meetings?

A. Yes.

Q. Prior to being shown that piece of paper, Mr. Zein had given the answers you testified to earlier?

A. Yes.

Q. And after being shown that piece of paper what did he start saying then?

MR. VIVIANI: Could we fix a date as to these meetings, your Honor?

MR. GOURAIGE: These meetings occurred, Judge, after January 21 but prior to February 13. There were many meetings, as many as five perhaps.

THE COURT: Do you have any notes that would show you when the date of this conversation was?

THE WITNESS: No, I don't.

MR. VIVIANI: Do you have any 302's of that day?

THE WITNESS: No, I don't.

THE COURT: All right.

Q. Can you tell us what Mr. Zein said after he saw that piece of paper?

A. He admitted to the fact that he did know the victim, that that was in fact his address and that was the telephone number.

Q. Did he admit that he did make the call?

A. He admitted that he had been in London on that day and that he did make the phone calls to the victim.

Q. During the week of the victim being held in captivity from June 6 --

A. January.

Q. I am sorry. -- January 6 to January 17, did the FBI have a Title 3 wiretap on Mr. Zein's telephone?

A. Yes, I believe he started it January 8.

Q. Were you listening to the conversations Mr. Zein had on that telephone?

A. Yes.

Q. Did you hear Mr. Zein tell the ambassador on January 8 --

MR. VIVIANI: I object to this line of questioning. It is irrelevant for the purpose of this hearing, which is, did he make any lies following his --

THE COURT: I don't know until I hear the answer. Overruled.

Q. Did you hear Mr. Zein telling the ambassador that he wanted the ransom payment be sent here to New York to Mr. Zein?

A. Yes, sir.

Q. Did there come a time that Mr. Zein changed his mind and had the ambassador make arrangements to receive the payment at Geneva?

A. Yes, sir.

Q. When was that?

A. That was -- he spoke to the ambassador on the night of the 9th, and said that he had changed his mind and that he was leaving the states and going to Geneva and he should be paid there.

Q. On January 8, did you hear a conversation between Mr. Zein and someone from the CIA?

A. Yes, I did.

Q. Could you tell us what was said in that conversation?

A. Well, the conversation was, Mr. Zein talking to this individual concerning the kidnapping that had taken place. Halfway through the conversation, Mustapha -- or Mr. Zein stops in the middle of the conversation, he says, "Why are you talking to me in this funny way? You didn't

talk to me like this yesterday." And Mr. Zein repeatedly asked him during the conversation if he had any information that any law enforcement agencies might have been inquiring about Mr. Zein.

Q. The arrangements for Mr. Zein to receive the ransom payment in New York had been made prior to that conversation?

A. Yes, sir.

Q. And it was on the 9th after that conversation that he changed the plans?

A. Yes.

Q. On the $3 million draft that was recovered from the Royal Bank of Scotland, are you familiar with that document, Agent Handley?

A. Yes, sir.

Q. Have you checked with Chemical Bank here in New York to find out what happened to that draft?

A. I checked with people at the Chemical Bank concerning the normal routing of such a check.

Q. What did they tell you?

MR. VIVIANI: Objection, Judge.

THE COURT: I will allow it. Overruled.

Q. What did they tell you?

A. They said that the check, because of the fact it was drawn in dollars and that the Bank of Scotland had an

account in New York, and from the markings on the check, the check would be returned to New York for payment before being sent back, because this is where their dollar account was.

Q. Do you know where Mr. Zein has checking accounts in New York City?

A. No, sir.

Q. Had you subpoenaed from one bank such records regarding Mr. Zein?

A. Yes.

Q. Do you remember the name of that bank?

A. No, I don't, but it was not the Bank of Scotland.

Q. It was not?

A. No, it wasn't.

MR. VIVIANI: We will concede it's Merchants Bank.

THE WITNESS: I am sorry.

MR. VIVIANI: Does that refresh your recollection?

THE WITNESS: Yes, it does. Merchants Bank.

Q. Do you remember on February 13 Mr. Zein telling you that while he was in Beirut he had returned the 3 million draft and requested the Beirut bank to cancel it?

A. Yes, sir.

Q. Sometime in March of 1986, did you have occasion

to learn from Scotland Yard how the check came to be returned to the Royal Bank of Scotland in England?

A. Yes, sir.

Q. Could you explain to us what route the check took before it was returned?

MR. VIVIANI: Objection.

THE COURT: It is all hearsay. Is there any dispute about it?

MR. VIVIANI: No, let him. I withdraw the objection.

THE COURT: Go ahead.

A. It was explained to me that the check was left at the Banque of Paris in Beirut. It went from there to the normal redemption process, which my understanding would be from Beirut to the bank in New York City, the Scotland Bank in New York City, who got it. It was not executed. They returned it to the Banque of Paris, main branch in Paris, from where it was sent back to London.

MR. GOURAIGE: No further questions.

THE COURT: You may cross-examine.

CROSS-EXAMINATION

BY MR. VIVIANI:

MR. VIVIANI: May this be marked Defendant Zein Exhibit A.

(Defendant Zein Exhibit A was marked.)

Q. That is a copy of a FD302, is it not?

A. Yes, sir, it is.

Q. And it is a copy of a 302 which was dated February 13?

A. Yes, sir.

Q. Does that FD302 recount a meeting that you had with Mr. Wilson of the U.S. Attorney's Office, Mr. Gouraige, Mr. Zein, and Mr. Batchelder?

A. Yes, sir.

Q. It also says in that, does it not, that others attended?

A. Yes, but it doesn't list all the people that you just mentioned, but they were there.

Q. I understand that. But you also say others.

A. Yes, sir.

Q. Were those others a Mr. Marrero and Mr. Marino of the CIA?

A. To my recollection, Mr. Marrero was definitely there. The other gentleman may have been.

Q. Do you recall that Mr. Marrero was in a separate room for a period of time with Mr. Zein and Mr. Marino?

A. On this particular date, no. I don't mean to mislead you, they did meet separately at a number of occasions, but I can't say specifically that it was on February 13.

Q. Was that the first time that you had ever seen Mr. Marrero in the company of Mr. Zein?

A. No.

Q. When had you seen him previous to that?

A. I am trying to be as specific as I can. I would say approximately the 24th or the 23th of January of '86.

Q. Where did that occur?

A. I believe it was in Mr. Gouraige's office.

Q. That exhibit in front of you recounts a meeting on the 13th of February.

A. Yes, sir.

Q. Roughly three weeks after Mr. Zein's first appearance before the magistrate on the 21st of January?

A. Yes.

Q. Is that, to your knowledge, the first meeting that Mr. Zein and Mr. Batchelder and you and Mr. Gouraige, along with Mr. Marrero, had with Mr. Wilson?

A. No, it isn't.

Q. When was the other time?

A. If it was not on the 24th, when Mr. Marrero first came up here, then it was in the subsequent week.

Q. Do you have a FD302 of the meeting that occurred with Mr. Wilson prior to the 13th of February?

A. No, I do not.

THE COURT: Is there a reason for that?

THE WITNESS: Yes. When they first came up, these gentlemen from the CIA, they would go into Mr. Wilson's office and I was excluded. And then it would break up and I would be in. And then I would be out again. And I presumed at the time they were excluding me for reasons of their own. And I felt that I couldn't write a definitive statement on what had happened because I had not been there for the entire time.

THE COURT: You weren't there for the entire meeting.

THE WITNESS: And when it got to be early into February and the meetings were continuing, I felt that I had to start recording what was going on so I'd have it for my own information.

THE COURT: And quoting that portion which you were privy to.

THE WITNESS: Well, after a while I was allowed in, I don't know at what point that happened, but I was then made privy to the meetings and I did start after -- it seemed to me that a lot of talking was going on and nobody was making any notes. And so I felt that I'd better start doing it, which I did.

Q. Correct me if I am wrong, Agent Handley, but did you prepare any reports, as that technical word is used in the FBI, to submit either to the bureau headquarters or to

the U.S. Attorney's Office?

A. Any reports as you and I know an FBI report to be?

Q. Yes.

A. No.

Q. No reports whatsoever --

A. No, sir.

Q. -- were ever submitted to the FBI headquarters or the U.S. Attorney's Office?

A. I am not trying to mislead you. You and I know what an FBI report is.

Q. Yes.

A. None was ever prepared on this case.

THE COURT: Is there a reason for that?

THE WITNESS: Times have changed. We don't do them any more, your Honor. I furnished Mr. Gouraige with the pertinent documentation that I had. I did notify obviously our legate in London and the FBI of the subject's arrest. But, as Mr. Viviani knows it, there is a technical FBI report.

THE COURT: That had the agent's name on it?

THE WITNESS: They are very rarely done any more. I haven't done one since I have been in New York.

Q. Putting aside a report, did you have any notation in the document which was a non-FD302 which would

reflect the dates of the various meetings that you attended, whether or not you reflected in there what was said?

A. At the time when I was working street cases, we have to make out a daily, it's called an FD356, it's a daily activity.

THE COURT: To show you are not at the ball game?

THE WITNESS: Right.

A. So I would write down basically what file number you are working on and where you are. So I would have, for instance, a file number on this, which is 7-368 and I would have United States Attorney's Office.

THE COURT: That would be a record that would show basically when you were meeting.

THE WITNESS: What days.

Q. Anything other than that?

THE COURT: I take it it was pretty much on a daily basis?

THE WITNESS: On some days. Some days the gentlemen from the CIA would be up, some days they wouldn't.

THE COURT: A fairly continuous thing from January 18 to February 13?

THE WITNESS: That is why at one point I wrote a 302 which is approximately seven, eight pages long where I encapsulated everything to that day.

Q. If you would, this meeting with Mr. Wilson, I

would ask you to read aloud the third paragraph.

A. "During that time Zein advised that he was in London on January 6, 1986, the day of the kidnapping. Zein admitted that he had made calls from his hotel room in the Intercontinental Hotel to the business of the kidnapping victim, Sadiq Al-Tajar. Zein refused to admit that he was physically involved in the kidnapping but maintained that just after making the phone calls to the victim he went to Heathrow Airport and flew back to the United States."

Q. A question was asked of him and he refused to admit. Is that what you say in that?

A. He refused to admit he was physically involved in the kidnapping but maintained after making the phone calls he went back to the United States.

THE COURT: Any idea what date this was said?

THE WITNESS: February 13, your Honor.

THE COURT: When did he deny any involvement? January 18?

THE WITNESS: He had denied involvement initially up until he was confronted with the scraps of paper.

THE COURT: Was it January 18 that this started?

THE WITNESS: January 18, the time of his arrest, and through that following week, your Honor.

THE COURT: So then at around January 25 he

admitted it?

THE WITNESS: He admitted that he had been in London and did make the phone calls, yes, sir. Yes, your Honor.

THE COURT: All right.

Q. Let me direct your attention to the day you arrested him.

A. Yes, sir.

Q. Do I understand correctly it was in the evening of January 18 at his apartment?

A. Yes, sir.

Q. Were you with someone else?

A. Yes, sir.

Q. Agent Pitts?

A. Yes, sir.

Q. Anybody else?

A. Yes, sir.

Q. Who?

A. Our supervisor, whose name was Daniel L. Bertrand.

Q. At the time you arrested him, how long did you remain in his apartment?

A. Five minutes.

Q. While you were there, did you seize a passport?

A. While I was there, Mr. Zein gave me his passport.

I requested it, he furnished it to me.

Q. Was he advised of his rights there?

A. Absolutely.

Q. Or at the office?

A. Both. He was advised orally at the time of his arrest, and he was advised of his rights when we took him back to the office.

Q. Did you speak to him on any length of time on the car ride to Federal Plaza?

A. We spoke to him on the ride back, yes.

Q. How about in the office? Did you speak to him in the office?

A. Yes, sir.

Q. Do you recall that you and Pitts were looking through his passport?

A. I don't recall it, but I probably would have, yes.

Q. Were you looking for an entry date into London for January 6?

A. I am sure I was.

Q. Did you see one?

A. No, sir.

Q. And you saw one for two weeks before?

A. There were a number.

Q. You testified that he had said he was not in

London on January 6 of '86 but that his last trip was two weeks before the 6th.

A. Yes, sir.

Q. Did you conclude that from viewing his passport, as distinguished from asking him that question?

A. Well, we asked him and that was the answer that he gave. It was then more or less confirmed by his passport.

Q. What I am saying is, what you wrote on your FD302 actually was not said by Mr. Zein but was concluded by you from looking into the passport?

A. No, that is not true. I believe -- I don't have the 302 in front of me -- the 302 from the night that he was taken into custody I would believe would have that in it.

MR. VIVIANI: Could this be marked?

THE COURT: Yes.

MR. VIVIANI: January 18. FD302.

(Defendant's Exhibit B was marked.)

THE COURT: What does it say?

THE WITNESS: The pertinent? "Zein stated he left the United States January 9, '86, arrived in Geneva on January 10, '86, and stayed at the Commonwealth Hotel in Geneva. Zein advised that he was in London last approximately two weeks ago but was not there on January 6, '86.

the day of the kidnapping. Zein stated that on his last visit to London he had stayed at the Carlton Towers Hotel."

Q. Let us move up to the 21st. The 20th is a holiday?

A. Martin Luther King Day.

Q. And on the 21st he appears before the magistrate?

A. Yes.

Q. Did you or Mr. Gouraige ask him for permission to search his home then?

A. I don't recall. If I did, we didn't get it.

Q. Do you recall looking for another passbook and being concerned about not finding another passbook?

A. Yes, sir.

Q. Let me show you again Exhibit A, which is the memo of the 13th of February. Is that a summary of what occurred during the meeting?

A. Yes.

Q. How long was the meeting?

A. I have no idea.

Q. Was it an hour, a half hour?

A. I would say it probably ran two hours or so.

Q. Was Mr. Wilson screaming at him?

A. Mr. Wilson raised his voice on more than one occasion, yes.

Q. And as your report reflects, is there a lie that Mr. Zein said during that meeting?

A. Yes.

THE COURT: What meeting is this, on February 13?

THE WITNESS: February 13.

THE COURT: All right.

THE WITNESS: Yes, sir.

THE COURT: What is the lie?

THE WITNESS: It says that he refused to admit he was physically involved in the kidnapping, but maintained after making the telephone calls to the victim he went to Heathrow Airport and flew back to the United States.

Q. How is "refusing to admit" a lie?

A. No, I am talking about -- he said he went to the airport after making the calls, where subsequently he admitted that he didn't, he went out and participated in the kidnapping.

THE COURT: He was in the car, I take it?

THE WITNESS: Yes, your Honor.

Q. May I see that? Which are you focusing on?

THE COURT: The portion that says he went to the airport.

THE WITNESS: He went to the airport, flew back to the United States, after making the phone calls. And

that is true, but if you get what I am saying, Mr. Viviani --

THE COURT: He leaves out the fact that he was there when the victim was taken into the car.

MR. GOURAIGE: Judge, I guess, in an effort to save time, I will concede that beginning on February 13, especially after he was confronted with that piece of paper on the 24th or 25th, Mr. Zein started to tell the government bits and pieces of information that he now maintains is the truth. But the government's point is that from January 18 to roughly the first week of February he repeatedly did not tell us the truth about his role in the kidnapping.

THE COURT: That is where we are.

Q. Did I take the 18th?

A. Yes, you have everything.

Q. So do I correctly understand that Mr. Wilson said were you involved in the kidnapping, and he said, "I refuse to discuss that" or "I refuse to admit that"? Is that the way it happened?

A. No. He had, since his arrest, to Mr. Wilson and anyone else, said that he was not involved in the kidnapping. His only involvement was that he had been contacted and requested or been required to act as a mediator.

Q. Let me back up a moment. Are you sure, sir,

that there were more than one meeting with Mr. Wilson?

A. Yes. There were at least four, probably more.

Q. At which Mr. Zein, Mr. Batchelder, you, Mr. Gouraige and Mr. Marrero were present?

A. I don't know if Mr. Marrero was there during all those occasions.

Q. But we do know that on the 13th he was there?

A. Yes, I would say he was. And others.

Q. And he is one of the others?

A. Yes. When I referred to others, that's who I meant.

Q. So if I understand your position correctly -- withdrawn.

On the 18th, when you were in his apartment, did you ask him if he had an attorney or if he wanted to call an attorney?

A. I don't recall if it was at his apartment, but we gave him the usual warnings and made a telephone available to him in the office.

Q. What was his response to that, if you can recall?

A. I believe he said that he did not have an attorney, but that he did use the telephone.

Q. Did he say "I want to call Langley?

A. That's who he called.

Q. And when he called Langley, did he ask for two

names?

A. Yes, he asked for two names, yes, sir.

Q. Bob Marino?

A. Yes, sir.

Q. And Fred Wright?

A. To my recollection, yes.

Q. Let me show you Exhibit B, which is in evidence.

THE COURT: Langley is what, the CIA?

THE WITNESS: Yes, sir. Yes, your Honor.

Q. -- and direct your attention to page 2, the second full paragraph. Could you read that aloud?

A. "Zein stated that he was in recent contact with Bob Marino of the Central Intelligence Agency, Lebanese Section, and a Fred Wright of the same office. Zein said that Bob knew all about the kidnapping matter but was afraid the money was going to an Arab terrorist group and advised him not to continue with the involvement."

THE COURT: I have read your sentencing memorandum and I have seen the transcripts of the tapes, so you don't have to go through all of that.

MR. VIVIANI: I am not.

Q. Did that statement that you have written in your FD302 come as a result of an admission that Zein said to you, or you overhearing him on the phone calling Langley and asking for Bob Marino and Fred Wright?

A. I obviously knew that he had done it.

Q. I know.

A. Because I heard the conversation.

Q. And you heard the tapes in which he was talking about making sure the money didn't go to the Abu Nidal group, right?

A. I don't recall that specifically. I recall that the gentleman he was talking to on the phone said something to the effect, well, we are concerned about where this money is going to end up.

Q. My question is, did he actually make that statement to you as it is written, or did you write that statement because you heard him on the phone to Langley asking for the two gentlemen?

A. Oh, he didn't call and ask for -- I don't believe I had ever heard of Fred Wright before he tried to call him on the telephone.

Q. How about Bob Marino?

A. Bob Marino obviously heard because he had asked for him on the phone.

Q. What is your response to the question?

A. My response to the question is that I wrote this down because that is what Mr. Zein told us.

Q. Let me mark this as Defendant's Exhibit C.

(Defendant's Exhibit C was marked.)

MR. VIVIANI: Your Honor, if we may for the record, it is a Xerox copy of a torn piece of paper.

THE COURT: This is the paper that was retrieved from the wastebasket?

THE WITNESS: It is part of it. There was more, but this is, yes.

Q. That is the piece of paper we are talking about that you recovered through your entry, pursuant to warrant, of his apartment?

A. Again, yes, this was recovered, but it was not the only paper taken from the trashcan. But, yes, this was taken from his trashcan during the search.

Q. At the time you took the paper out, you knew that one of those numbers was for Sadiq, did you not?

A. No, I did not.

Q. When did you learn that number?

A. When I contacted Scotland Yard with the numbers we had found.

Q. Was that before his arrest?

A. Yes.

Q. Had you shown him that document prior to Mr. Wilson showing him that document, which you testified to was the catalyst for him to say yes, he made the phone call, had you shown him that?

A. No, I had not.

Q. There is a second number on that, is there not?

A. Yes, sir.

Q. Weren't you concerned about who that person was, who the second person was?

A. Yes.

Q. You thought it was one of the terrorists?

A. Well, we thought there was a possibility it would have been involved. We were interested in finding out who the second number belonged to.

Q. And that is the number on top of it?

A. On the top, right.

Q. And did you ask him that on the 21st?

A. Somewhere I did ask him what the number was. But I believe it was -- I remember being a bit miffed at Mr. Wilson for showing it to him to start with, because I don't think that Mr. Zein knew we had been in his apartment and in fact we had it. But once it was out, I did ask him what the other number was.

Q. Well, he was notified on the 22nd of January that you guys had been in?

A. Yeah, OK.

THE COURT: This is on the 21?

THE WITNESS: No, this was subsequent to that.

Q. Before the meeting on the 13th had you shown that to him to ask him who the other number was?

A. I never asked him what the other number was until Mr. Wilson confronted him with the paper, because I was rather anxious to keep it to ourselves that we even had this.

Q. Scotland Yard openly called that number, didn't they, the second number?

A. They went out to the address.

Q. And they arrested the person?

A. I don't know what the rules over there are, but they conducted a rather lengthy interview.

Q. I heard 72 hours.

A. I don't know what that is. But they were very interested in the people at this address, and they did in fact conduct interviews and detain some people there, it is my understanding.

Q. Weren't you concerned at the time you arrested him or on the 21st or at any other time up to February 13 precisely whose number that was? Did you ask him without showing the paper whose number is this in London?

A. No.

THE COURT: Did you determine whose number it was?

THE WITNESS: Well, the number from the papers obviously in London. And I relayed it to Scotland Yard and let them find out whose number it was.

WC



THE COURT: Were you ever told whose number it was?

THE WITNESS: I was never told. It turned out to be of no consequence when they investigated the number in London.

MR. VIVIANI: If I may just have a moment.

THE COURT: I don't think you can go much further with this witness.

Q. Incidentally, let me direct your attention to the check.

A. Yes, sir.

Q. You went to the Chemical Bank?

A. Yes.

Q. Did you go --

A. I didn't go to the Chemical Bank. I phoned someone at the Chemical Bank to find out the normal procedure of international bank drafts.

Q. When did you do that?

A. Three days ago.

Q. Is that the first time you did that?

A. Yes, it is.

Q. Did you go to the Bank of Scotland on 63 Wall Street?

A. No, I did not.

Q. Did you go to the --

THE COURT: Were you told what the procedure was in the case the check was canceled, say, in Paris or Lebanon? What happened to the check? Did it go back to New York or what?

THE WITNESS: It would be sent to New York because of the fact that on the check it has the Bank of Scotland, 63 Wall Street, and that according to the bank people is where they send the check. That gets it back to the owner bank, who then forwards it back to their system.

THE COURT: So regardless of whether the check was actually presented for payment or canceled, it goes back to the bank anyway?

THE WITNESS: Yes, sir.

THE COURT: So we can't draw any inferences from the fact that the check goes back to New York?

THE WITNESS: I can't.

THE COURT: Well, I can't either if you can't.

Q. One other question. Did you go to the Banque National de Paris in New York City?

A. No, I did not.

MR. VIVIANI: Another second, your Honor.

(Pause)

Q. Concerning the check, do you recall asking Mr. Zein in his apartment on January 18, or in the car or at the FBI headquarters, whatever happened to the check?

A. I don't know if it got that far. Eventually I did.

Q. Did he tell you it was canceled?

A. Yes. He said he left it in the bank because it was replaced by the other money.

THE COURT: In the bank at Lebanon?

THE WITNESS: Yes, your Honor.

Q. Do you recall any time between the period January 21 and February 13 when you and Mr. Gouraige brought Mr. Zein to Mr. Gouraige's office and he refused to talk to you and asked you to take him back to the MCC?

A. Yes.

Q. Do you remember on how many occasions that occurred?

A. Between those two dates, I remember very distinctly once. Now, subsequent to that there was another time, probably I would say last summer sometime, where he in fact --

Q. I am focusing you on --

A. I remember one time.

Q. Returning now once more to the meeting on February 13 with Mr. Wilson and everybody else, do you recall Marrero or a discussion about the possibility of Mr. Zein getting bail or Marrero asking about bail?

A. I remember bail was discussed, but I don't know

who discussed it.

Q. Do you remember Mr. Zein at that meeting saying anything about him wanting -- him if threatened by the PFLP would rob Fort Knox provided there was no loss of life? Do you remember a term like that?

A. No.

Q. Do you remember Mr. Wilson saying that he wanted bodies, that he wanted Mustapha Zein to implicate individuals? Do you remember anything like that?

A. I remember his wanting the identity of the other individuals involved in the kidnapping, yes.

Q. Was this at the February 13 meeting?

A. He said it a number of times in talking to Mr. Zein. He said, you know, we want everything and we want the other people involved and we want you to identify them."

Q. Have you any recollection of Mr. Wilson asking at this February 13 meeting where the $3 million check was?

A. That was also asked a number of times. Whether at that particular meeting I don't know. The check as far as we were concerned was missing for some time, where in reality it had probably been returned quite some time before we found out about it.

Q. Do you remember Mr. Wilson screaming at Mr. Zein that he was a terrorist and a kidnapper, and Mr. Zein responded, "I am not, I save lives"? Do you remember that

happening at the February 13 meeting?

A. Frequently.

Q. Do you remember Mr. Marrero agreeing with Mr. Wilson that in fact he has saved lives?

A. Yes, he would allude to that again frequently through these meetings.

Q. Do you remember Mr. Wilson saying to Mr. Zein at the February 13 meeting, "I have evidence that you called him from your room at the London hotel," and Mr. Zein responding, "According to my knowledge, local calls are not placed on the bill." Do you remember that?

A. The way it came about, Mr. Zein when confronted admitted he made the phone calls, but we had his hotel bill with the calls listed on it, and he admitted that he did not know that the calls were a matter of record.

Q. I am saying, do you recall him responding in that way? That is the important question.

A. Not the way you said it. He said, "I didn't realize the calls were made a matter of record."

Q. Do you recall Mr. Wilson saying the computer has it, and Mr. Zein responding in words or substance, "Fine"?

A. Yes, basically yes.

Q. Do you recall Mr. Wilson saying, "You're putting yourself in a deep hole," and Mr. Zein responding at this February 13 meeting, "All of us are in a deep hole"?

A. I don't recall that. It could have. It could have been said. I don't recall it.

Q. Do you recall when you took Mr. Zein, I assume you took Mr. Zein back to the marshals to bring to the MCC, brought to the MCC, words to the effect, "Boy, you got some balls saying that we are all in a deep hole"?

A. I said that?

Q. To Zein.

A. Mr. Wilson was supposed to have said this?

THE COURT: What does this have to do with anything?

MR. VIVIANI: Judge, I am trying to corroborate what was said at which meeting. Mr. Zein obviously recalls a lot about a particular meeting. The more events he recalls happening, the more I can take that the conversations occurred at the 13th where there were no lies.

THE COURT: First we have to lay a foundation for that. I haven't heard your client testify.

MR. VIVIANI: Not yet judge. That is one decision we will make.

Q. Do you recall anything like that?

A. You are trying to narrow me down. I am not trying to mislead you. You are trying to narrow me down to did it happen on the 13th.

THE COURT: That you were all in a deep hole.

Does that help you fix the date of the meeting?

THE WITNESS: No, not at all. The meetings were just, Mr. Wilson would yell something, somebody else would yell back, and it was almost like one continuing meeting for over two weeks.

Q. Final question: Do you recall the CIA needing a period of time to clear everybody, to hear all the goodies that Mustapha Zein had done?

A. You mean before they told us about what he had done?

Q. Yes.

A. Yes.

Q. Do you recall that being part of the conversation on the 13th?

A. No.

MR. VIVIANI: I have no other questions, Judge.

THE COURT: Anything further?

MR. GOURAIGE: No further questions.

THE COURT: You may step down.

(Witness excused)

THE COURT: Do you have another witness?

MR. GOURAIGE: I don't have any other witness, your Honor.

THE COURT: All right. Defense?

MR. VIVIANI: Mr. Zein.

M U S T A P H A  M O H A M M E D  Z E I N, called as a witness in his own behalf, being first duly sworn, testified as follows:.

MR. VIVIANI: May I proceed, your Honor?

THE COURT: Yes, go ahead.

DIRECT EXAMINATION

BY MR. VIVIANI:

Q. Mr. Zein, I direct your attention to January 18, 1986, the day you were arrested. Please tell us what time you were arrested at, approximately.

A. I was arrested around 10:30 at night.

Q. Could you please keep your voice up?

A. 10:30 at night, p.m. Around that.

Q. At your apartment?

A. Right.

Q. For how long did you remain in your apartment following your arrest?

A. About three or four minutes, five minutes.

Q. Did you make a phone call from your apartment?

A. None whatsoever.

Q. I am sorry?

A. None whatsoever.

Q. After your arrest where were you taken?

A. To the FBI building.

Q. Incidentally, did you give them your passport?

A. Yes. He asked me, "Bring your passport." I brought it.

Q. Upon arrival at the FBI did you make any phone calls?

A. Yes, I made one phone call after they asked me if I have a lawyer and I said I don't but I would like to, like, leave a message to somebody in Langley.

Q. Did you make a phone call?

A. As a matter of fact, Mr. Handley dialed it for me. I didn't have the number.

Q. Did you speak to someone on the phone?

A. The operator -- the answering service or the operator or the officer on duty at that time.

Q. Will you please just tell us what you said in that conversation?

A. I just stated briefly, I said, "Please leave a message for Mr. Marino and Mr. Wright that I am in the custody of the FBI."

Q. During the period of time that you were with the agents, did they advise you of your rights?

A. They did.

Q. And I believe you may have signed a document to that effect?

A. I did. I remember.

Q. Could you tell us what questions were asked of

you and what answers you gave to Agent Handley or the other agents?

A. They were asking me about my background, my name, my family, my educational background. And the one who was asking me was the other gentleman, not Mr. Handley. But when it came to a very detailed questions about my family, I said I refuse to answer any more questions, they have nothing to do with this. And I terminated the conversation.

Q. During the period of time did you see the agents looking for your passport?

A. Yes, they were looking very hard.

Q. And they were looking for a date?

A. Right.

Q. What had you done to your passport while flying back from Switzerland?

A. Let me give you a background to understand. The night before I came to New York, I was in Athens.

MR. GOURAIGE: Judge, could I just have him answer the question rather than give us a narrative?

MR. VIVIANI: Judge, I will get to the point. Let me withdraw that question.

THE COURT: I assume he did something to the passport on the plane.

MR. GOURAIGE: I would like him to answer that question.

THE WITNESS: Yes, I am answering the question. I am volunteering to come to the stand and I am ready to answer any questions. In the hotel, your Honor, there is a TV, and we got news and everything. I got all the reports that were being broadcast in the United States about the case. I even called the United States, to some friends, that didn't know anything about anything. And I said, "Give me, please, a wrap-up of CNN News, what are they talking about. They told me the whole story: that Interpol was shadowing Mr. X from Geneva to Rome, to this, to that. And as a matter of fact they made a copy of the tape, of all the news that was being said in the United States about the case. And they said also on the news that they were looking for that man.

Next day I took a plane. I could have changed any direction I want. I didn't. Of course, hearing the news, I was expecting an Interpol agent next to me on the plane, because I knew I was going to be arrested at the airport the minute I arrived in New York. As a matter of fact, I found one in first-class. You see, the plane, your Honor, it's one class downstairs, and the first-class in the upper deck, in the 747. So he had, or whoever is going to watch me, had to go up. He couldn't sit in the back and watch, because there's two different compartments.

And I watched him coming to the plane. And, you

know, when you sit down, your Honor, whether it's my imagination or not, I am just giving you the impression, usually, if you are cold, it's January, coming to New York, but this gentleman didn't even have a coat on to give to the stewardess. So I took it for granted he was Interpol or some police.

Your Honor, definitely I was trying to hide my role, not from the other, but from the publicity. Because I knew --

THE COURT: The question really is: What did you do with your passport?

THE WITNESS: Let me tell you, your Honor. So I was expecting to come, the minute I arrived to New York, flash bulbs, TV, and everything. And of course they are going to look at my passport and find that I am in London and it is going to be reported to the press and everything.

From the beginning, your Honor, if you remember you made a statement in last August, and you made a political statement and you said you shouldn't make a political statement but you made a political statement. You said, and if I quote your Honor, you said, to resolve this issue you have to hide his role. I wasn't trying to hide my role from the government, but I was trying to hide my role from the public, from the media. And I am still trying to hide my role from the public and the media, your

Honor. Because if my role has ever been discovered in reality in the press, it is going to drag down the whole story. And that's, I am not -- I wasn't prepared to do it because it concerns national security, the safety of my family, a relation that has lasted for seventeen years. It concerns lives.

So while I was on the plane, to avoid the publicity, I took a scissor from my briefcase and I cut the page, to avoid the publicity at the airport.

THE COURT: Wouldn't there be a gap in the book or not?

THE WITNESS: They didn't discover it until I told them. They were after me for two weeks, they want to search my apartment. Harry asked me, "What do you have in your apartment?" I said nothing. They are looking for a passport. And when I gave the statement, Mr. Handley was sitting, I said, "I know you want to know about the passport."

He said, "Yes, I want to know about the passport."

I said, "Did you notice the number of pages? It is 87, and then 91."

"Where is that missing page?"

I said, "You are going to break the mile record running to your office to look at the passport."

He said, "You bet your life."

The next time I saw him I said, "Did you check the passport?"

He said, "Yes I checked it."

I said, "Was I right?"

He said, "Yes."

That is the story of the passport. Never, no one ever asked me on the 18th if I was in London or not. Never, never that question was asked.

Your Honor, if I was being asked by the chief criminal investigator, and I was refusing to answer -- I was volunteering information right and left. I knew what was involved.

The reason that I withheld the answer, I did not deny, and that's why when we were talking with my lawyer Harry, he said, "I did not tell your to lie. I said don't admit." I refused to admit. Your Honor, if someone asked if you were in the room when that many calls was put, and I say, "I refuse to admit," I am admitting. Either I was or I wasn't. If I refuse to answer that question, I am admitting. That's one.

Secondly, the Perry Mason type of issue, when they showed me that piece of paper, I fell through or broke down? It is not true. I knew it before I came in. Because when I was with Agent Marrero in that room, he said, "We have to tell them what happened." I said, "You tell

your role, I tell mine." That was the condition. "Tell your part of the story, I will tell mine." I didn't mind telling the government,. And in the conversation on the phone, your Honor, all the time, I said, "I will tell you all." He said, "But they got you locked in with calling Sadiq by phone."

I said, "That is not important. I am not worried about it." I didn't worry about the paper. But what I put in my mind I called Sadiq from my apartment and it was January 1. I thought, searching the apartment, they have asked the telephone company and his name was on my bill that month. It doesn't take Sherlock Holmes, you know, to think I have to hide it. It's on my bill.

THE COURT: What I am trying to find out is what your testimony is.

THE WITNESS: You see, your Honor, it wasn't no strain. I mean, I wasn't surprised.

THE COURT: There has been testimony here that you did deny these things when you were first spoken to, and you deny that you did or what?

THE WITNESS: No, I never denied. I did not admit, your Honor. I said I refuse to answer that question. I never denied. Never. And this, that I broke down when I saw the paper? I already knew that they knew I called Sadiq. It is more serious than the call in London. Your

Honor, when he asked me on the call in London, I said, "Well, I didn't know that local calls are subscribed to your room." And if you see the evidence, it is not subscribed to my room, your Honor. It is logged in the hotel. And they had to get an affidavit from the operator to say this was called by that room.

THE COURT: What is your recollection of what happened on the 18th? What did they ask you and what did you tell them?

THE WITNESS: He said, "You were talking to the ambassador. When did you first talk to him?"

I only answered one question. I said, I received the call at 6 o'clock, which is true I did, and I was acting to negotiate a ransom. I never mentioned that the CIA knew anything. As a matter of fact, your Honor read the transcript. I knew they were taping my phone --

THE COURT: Were you asked about whether you were in London on the day of the kidnapping?

THE WITNESS: No, sir, never. Never. And I swear in the holy name of God, no. Never. Because how? Your Honor, I was using my credit card. I was leaving trail the blind could follow. How could I?

Secondly, if I denied it, he was there, he has my passport in his hand. Why didn't he ask me, "Why is it that the stamp of London is missing from your passport?"

Why didn't he ask it? Did he ask that question? He has my passport in London.

THE COURT: I am trying to find out your version; we have already heard his version.

THE WITNESS: You know, he's got my passport and that's the first thing they were looking for, the stamp in London. I let it go. I didn't volunteer any information. I let it go, because I wanted everybody to be present, everyone, because I don't know what statement they were going to make to the press the next day, whether there is a gag order or not. Did he ask me, "Why this entry visa? You know you were in London. Why isn't it on your passport?" Did he ask me that question? No.

THE COURT: You are testifying. You can't ask me questions.

THE WITNESS: Your Honor, you can see the report. Did he admit he asked me that question, which should be the most natural question to ask if you want to catch somebody? If they are saying I made false statements on unreported reports, would he forget it to make a statement when they were setting me up with the Scotland Yard to make statements? Would it escape his memory to make a report, that at such-and-such a date somebody asked me a question and he denied and he lied?

THE COURT: Those are arguments. Do you have

any more questions?

MR. VIVIANI: Yes, your Honor.

THE WITNESS: No reports.

THE COURT: Those are arguments. Let your lawyer argue.

BY MR. VIVIANI:

Q. We do know from the evidence that there was a meeting with Mr. Wilson, Mr. Batchelder, Mr. Handley, Mr. Marrero, Mr. Gouraige, on February 13, 1986?

A. Right.

Q. Do you recall attending any other meeting with Mr. Wilson and those individuals I have just named?

A. I think that was the first time.

THE COURT: February 13 was the first time?

THE WITNESS: I remember this is the first time. Because, you see, I have to associate, because he said this is the time when he showed me --

THE COURT: The paper.

THE WITNESS: -- the paper. So it must be in that meeting.

THE COURT: Is that the first time you saw Wilson?

THE WITNESS: Your Honor, I really don't remember. But I believe, because, you see, from my memory is this: Mr. Batchelder every day I ask him, "When is

going to be the meeting?" He said, "They are trying to clear everybody up." I said, "How long does it take?" Three weeks, it took, or two weeks or whatever.

At the same time I was getting the bullpen therapy, what you call. 5 o'clock in the morning till 7 o'clock at night, and they return me to the MCC, on those metal benches. Every day. And nothing. Until I was up to here. I asked the marshal, I said, "Does the Judge want to see me?" He said no. "Does the magistrate want to see me?" He said no. I said, "Who wants to see me?" He said, "The Assistant District Attorney." I said, "I don't want to see him. Return me to the MCC." I returned. And Harry came to the MCC. "Please, you have to see Mr. Wilson, you have to see Mr. Wilson." He had to send me a card.

MR. VIVIANI: Let me mark this as Exhibit No. 4, your Honor.

(Defendant's Exhibit 4 was marked.)

THE WITNESS: And I kept it. And this is the old address of Mr. Harry.

THE COURT: All right.

THE WITNESS: And I said, "I refuse." He said, "But the people, they came from Washington and they went to meet with you and speak with you." I said, "Fine."

Q. Did you go to the meeting?

A. I did

THE COURT: Was this the meeting on February 13?

THE WITNESS: Right.

Q. Who takes you from the lockup in the Marshal's Office to the U.S. Attorney's Office?

A. Mr. Handley.

Q. And are you put in a room with Mr. Marrero and Mr. Marino?

A. Yes, before I even come to Mr. Wilson.

THE COURT: I want to understand this. Between January 18 when you were arrested --

THE WITNESS: I came many times to his office, Mr. Gouraige's office.

THE COURT: I am trying to figure this out, because you said you were left in the bullpen. Between January 18 and February 13, how many days did you actually get into the U.S. Attorney's Office to see Mr. Gouraige or --

THE WITNESS: I think about two, three times. That's when Mr. Batchelder threatened to go to the press if the people from Washington do not come.

THE COURT: So the people from the CIA were not at those meetings?

THE WITNESS: No.

THE COURT: So it was just you and your lawyer and Mr. Gouraige?

THE WITNESS: Yes. We were talking.

THE COURT: And your memory is that Mr. Wilson was not present at that meeting?

THE WITNESS: He wasn't present at that meeting.

THE COURT: When did this bullpen treatment begin?

THE WITNESS: Before.

THE COURT: Before? But when? But after the 18th?

THE WITNESS: Yes, after the 18th.

THE COURT: The first week in January?

THE WITNESS: Yes, and the second week and the third week.

THE COURT: But how soon did you finally get in to see Mr. Gouraige?

THE WITNESS: Oh, we went about once or twice to ask when the people are coming, and he said he wanted to make us -- I didn't want to talk to him.

THE COURT: So there were no extensive discussions, you say, between the 18th and February 13?

THE WITNESS: Nothing.

THE COURT: That is what I am trying to find out.

THE WITNESS: That's why nobody made a report.

THE COURT: All right.

THE WITNESS: The only substantial meeting that took place, your Honor, is that 13th. That is when --

THE COURT: Tell me what happened on the 13th.

THE WITNESS: The 13th. I came up, they took me to another room, and they said --

Q. Could you please identify who?

A. Mr. Marrero and Mr. Marino. And I asked, "Where is Mr. Reilly?" He said, "He's very busy, but we are here." And the whole meeting, your Honor, for that time, to stop me from going, ask for bail, because they don't want me to take the stand. Three weeks and no bail yet. It took eleven months, but that's different, the first bail hearing. And the whole meetings previous to that is to stop me from asking for bail hearings so I do not take the stand. I said, Please arrange it and let the government agree to pay. I am no threat to the public and I have no intention to run away from anything. I came. I knew I was going to be arrested at the airport in Kennedy Airport.

And they were shuttling between my room and Mr. Marrero's room. What was said? I don't know what was said. At the end they said, Mr. Wilson is going to go on a high-level delegation to England, or he came back from England, some -- I don't remember, you know, whether he came back from England or he is going to England. I said, the most important thing is to end the issue here for all our sakes. End it here. And I am ready. If there is a pound of flesh you want. I can give it to you, don't worry. I will give

it to you. Let us end it here.

Then they come up with this suggestion, the deal, in that meeting, and they showed me the paper and everything. And I was, you know, your Honor, I mean, to break down -- they got, they got the paper and they got Sadiq's number, and when his number is on my telephone bill, i mean, can you imagine that I didn't think the FBI had it?

Q. Mr. Zein if I may direct your attention, there is a period of time you were in the room with Mr. Marino and Mr. Marrero?

A. Right.

Q. Is that prior to your going into the room with Mr. Wilson?

A. Before I went to Wilson.

Q. Did anyone tell you in that room about the government having Sadiq's phone number?

A. No. They said they got you locked in. They didn't tell me. It is part of the conversation. "Mustapha, we cannot get you bail, we cannot ask for bail, they are not accepting bail because they got you locked in with Sadiq's number." I said I know. I know that. I know that before I even went to the room. Because it takes a moron to be surprised on a little piece of paper when I got Sadiq's number on my bill that month.

Q. So your testimony is that you believe that they

had you locked into Sadiq from your telephone number?

A. In the apartment.

Q. I understand. But in fact you knew from Marrero --

A. Yes, before I went to the room.

Q. -- that they knew you had Sadiq's number?

A. Right.

A. And, for a point -- he wasn't trying to tell me secrets or anything -- to emphasize a point, he said, "They are not agreeing to your bail because they got you locked in."

THE COURT: They got you locked in.

THE WITNESS: Yes, to the number. I said, "It's not important. Don't you know how involved I am? If they have to" -- and I repeated that same thing, if I have to participate in getting for the knocks, I would have done it so nobody would get hurt.

Q. At some point in time you leave the room with Marrero and Marino and you go into Mr. Wilson's office?

A. Right.

Q. And who did you go in with?

A. Mr. Batchelder.

Q. And is Marrero there?

A. Right.

Q. From the beginning to the end of the conversation, would you testify as to your recollection as

to what was said, and please identify the speaker.

A. They were talking about terrorism, this, the trouble you have caused, and I was trying to keep my temper and everything, you know. And I was repeating, you know, terrorism? I said, "I am a peacemaker."

"You did it for money, you did it for this."

I said, "What do you want me to do?"

"We cannot find the check."

I said, "Do you want me to sign a letter to the bank telling them it is canceled and reiterating my order to the bank to cancel it?"

He said, "But where is the check?"

I said, well, I canceled it. The bank that is supposed to pay the check is the Royal Bank of Scotland. If the check reached New York and if it wasn't canceled, what is the normal procedure for that check to go? To the Royal Bank of Scotland. Did anybody go and ask the Royal Bank of Scotland in New York, "Did you see that check?" They are going to say, "No, we don't even have a record of it. We have not seen it."

Who is going to pay that check if the bank who was supposed to pay it hasn't seen it? Because the check was canceled in Beirut. And it is an irrevocable check, they couldn't cancel it themselves. And they held the [illegible] of [illegible] getting interest all that time, all

that time. And they deducted the amount of the check from his account anyway. And they would not reimburse the ambassador of the $3 million until they had the check in their hands in London. All you needed to do is wait seven days for it to clear and the Scotland Bank in New York would have paid it on the dot.

Q. We are getting far afield, Mr. Zein. Let us direct our attention to what happened in Mr. Wilson's office.

A. Yes. We were talking about the check. I said I returned three millions and I am risking my life on it and they know it. And for afterward, weeks, trying to get the check from England, the CIA and I were trying to explain it to Mr. Gouraige. Don't bring it the long route from Washington. Get it direct. Because if the PFLP knew I got that check and they could have gotten it, we are back to square one. And I was being terrified of that check. As a matter of fact, I wish it never existed. Even if it exonerated me, I didn't want exoneration because it was going to affect my family.

Q. Please.

A. Anyway we were talking about the thing. And then the number that they asked me, it wasn't Sadiq's number. He asked me about the second number. After Mr. Wilson showed, he said we got this. I said --

Q. Referring to Exhibit C?

A. Yes. I said, "That's good."

"Oh, we got this, and it is in your handwriting. And we can get an expert to match your handwriting."

I said, "Mr. Wilson, ask me this question in court. Don't ask me these questions here."

He said, "Is this your handwriting or not?"

I said, "Ask me this question in court."

And then suddenly --

THE COURT: I take it you weren't too fond of Mr. Wilson?

THE WITNESS: No, I wasn't and I am not.

Q. Could you give the flavor of the questions? Was he screaming?

A. He was screaming like holier than thou, you know. He thinks, you know, he said, "You are a man who is already broken down." I answer him back. He tells me, "You are in a lot of hot water."

I said, "We are all in hot water."

Is that a breakdown, confession? And then I ask saw Mr. Handley --

THE COURT: You don't have to belabor that. Having read the presentencing memorandum of the things you have been involved in, I really don't seriously think that you were intimidated by by Mr. Wilson. I really don't

think I am going to believe that.

THE WITNESS: Your Honor, I even told Mr. Gouraige a lot of times, I said, "Don't think you can intimidate me."

THE COURT: I don't think I would draw the inference that, given the experience of having been kidnapped by some of these people for a lengthy period of time, that you would be seriously worried about Mr. Wilson's intimidation.

THE WITNESS: No, I wasn't, I wasn't.

THE COURT: Don't worry about it. You don't have to persuade me. I am already persuaded on that.

THE WITNESS: Then the question that was asked on the phone, not the second one, your Honor, the first one. And I honest to God, I forgot whose telephone number it is. Look at the paper. And I even advised him before he even took the stand so he is not astonished at it. That was the number that I wanted.

THE COURT: The 794 number?

THE WITNESS: The upper one, your Honor.

THE COURT: This one?

THE WITNESS: Yes, this. Do you see, your Honor, H, and you see an address? You see, I advised them later on I have locked it up in my head. I don't know, they kept repeating, and what's this number, what's this number. I

said I don't know. And later on when I gave the full statement, your Honor, I said this was given to me by Peter on previous times.

THE COURT: By Peter?

THE WITNESS: Peter. And for the life of me, at that time I just couldn't remember. And two weeks ago when they came up with the paper, and I even told Mr. Handley now, before he took the hand, you see H, your Honor?

THE COURT: I see.

THE WITNESS: And you see the number circled one, the number circled two. And here is Sadiq. That is the tourist number. Then I was looking at the address. It is --

THE COURT: Grosvenor Square?

THE WITNESS: Grosvenor Square. This is the address -- I didn't remember it, you know, when you are in London, you know a building, but you don't know what the number of the building is. I have been to that, to this building many times. It is a palace, your Honor, in Grosvenor Square. That is where the ambassador has got his financial group, investment.

THE COURT: Which ambassador?

THE WITNESS: Mr. Tajar. And H, Peter told me that is the telephone number of Haddan, the real number. At that time when he gave it to me, I blocked it out of my

head. I didn't want to call that number. I didn't want to approach that place. And I started concentrating on the second one, not the first. And I forgot it complete.

When they brought the attention of this paper, and I asked Mr. Handley to ask Scotland Yard, I asked, when it was brought about, I made calls, and that's how I found this is the address of the palace. It's beautiful. It was for a lord, you know. And he's got his offices for financing and everything, he's got, like, six or seven hundred million dollars investment in the United States alone. And they were running, and that's what Handley goes, to this office. This number used to belong to the office when they had partners, your Honor, and it was disconnected from the office and was given later on to a Frenchman. They thought it was Peter. I never called that number, otherwise that Frenchman would have testified after he was caught, he got a telephone --

THE COURT: He is the German who speaks Arabic?

THE WITNESS: Right. And they put him in 72 hours and all that, and this is, if they check it, this number used to belong to this address. It belonged to other groups of business partners, Mr. Tajar had in that address. And I blocked it completely. That was the number that I was being questioned on and I was saying I don't know. Not this number, your Honor.

THE COURT: All right. Any more questions?

Q. Without digressing and as briefly as you can, Mr. Zein, could you please respond to what was said in Wilson's office at the meeting concerning --

THE COURT: I think he has told us. Is there anything else other than what he has told under the circumstances?

THE WITNESS: You see, the meeting, your Honor, that is the meeting that Mr. Gouraige was trying to pinpoint at the last session we were there.

THE COURT: If I understand your testimony, Mr. Wilson talked about terrorism, told you about the numbers?

THE WITNESS: That is when he said I lied. That is the meeting. If I lied on that number, where is it on his report? Where does Mr. Handley say that Mr. Wilson asked me the number and I lied?

THE COURT: The government's theory was that you lied on the 18th.

THE WITNESS: Your Honor, that was the time they showed me the paper, when he said he advised the government.

MR. VIVIANI: I thought last session we were here that they said he lied at the meeting with Wilson, Judge. I thought that was the point of this.

THE WITNESS: With Wilson. That was the point.

THE COURT: I haven't heard any testimony from the government of any lies at that meeting. All I heard was that he was confronted with the number and then admitted his involvement.

THE WITNESS: Your Honor, I admitted my involvement. In the report --

THE COURT: In any event, I don't think this thing has a great deal of significance in the overall sentencing.

MR. VIVIANI: Judge, I have no more questions.

THE WITNESS: Your Honor, I admitted at that time, according to the paper --

THE COURT: Wait. I don't think this is going to impact the sentence very much. When I read the presentencing memorandum, I don't think this whole question of who admitted what and when impacts the sentence very much. It is very clear to me that the CIA was very aware of his involvement in this whole situation, well before he was arrested. If one branch of the government knows, I really can't worry too much about whether he did or did not tell the other branch of the government what he was doing. I reviewed that tape very carefully, and it is very plain to me that Mr. Marino was well aware of his situation. So I don't think I have a great deal of problem with that. It is the government as far as I am concerned.

THE WITNESS: Yes. He said I committed criminal offense before I even went to Beirut.

THE COURT: I understand that.

THE WITNSS: And that is not --

THE COURT: I think that we can short-circuit this hearing, because this alleged false statement is not going to impact the sentence one bit.

MR. VIVIANI: Thank you, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

(Witness excused)

THE COURT: I have only one question I want to put to you before we proceed to the sentencing proper. I don't know how much of an allocution I need because we have been putting allocutions here. These are closed proceedings. There is an advantage, since international relations are involved here, in structuring a sentence. The suggestion has been made that he get time served. I don't know that that is a great sentence to impose from the standpoint of diplomatic relations with England, if I may look at it that way. It may well come out to be the same way --

MR. BATCHELDER: I have no objection to that. I know what you are striving at.

THE COURT: What I am saying is that it

wc

certainly would appear that he has been given a slap on the wrist, whereas a sentence for a term of years may translate to the exact same jail time as time served and would have a better appearance in terms of international relationship with England, which the government and you and I have to be concerned about.

MR. BATCHELDER: I would agree with that.

TH COURT: We haven't had a presentence report on this man and we don't know what the parole release guidelines would be, say, for an indeterminate sentence of X years.

MR. BATCHELDER: Your Honor, I can get those for you, and I can give it to you pretty much on the mark.

THE COURT: I want to be sure. I can tell you for the record, and I don't think we have to go much longer on this, that I have read the memorandum and I have read the whole situation as far as I can understand it. I would say two things which are pertinent to the sentence here, which are on the record. This record is sealed, but if it ever becomes unsealed, obviously it should be said.

The first thing is that regardless of whether his story is true or untrue about his connection with the CIA and his duress in connection with this particular situation, he has done enough for the United States Government over the course of the last ten or fifteen years,

and no one has seriously disputed that, in terms of substantial contributions to international affairs, saving lives and whatnot. I think the government does not dispute it. I think your memorandum is not substantially challenged on that issue. Were this an ordinary situation where a defendant was given the benefit of cooperation with the government, he would be entitled to a very large marker merely based upon what he has done already in terms of assisting the United States Government, both the CIA and the State Department, and in some very, very touchy situations which have exposed him to substantial personal risk in a very complicated situation which the average citizen could not even imagine.

I think we all know that. The public doesn't know it, nor can the public know it, nor can people who read about this type of thing in the newspaper ever possibly imagine the complexities of the situation in any international area, especially in the Middle East. The memorandum you submitted reads like a novel in the sense of so many factions at war with each other and so many complications created by personalities which far transcend even the international situation involved.

So I think there isn't any question that he has been of material assistance to the government in the past.

[illegible] did [illegible] his story about his participation

in this particular situation under duress, I think he would be entitled to a very large discount on his sentence based upon cooperation already given.

I have given substantial consideration to the sentences I have given in other cases, including narcotics cases, where the contributions to the overall scheme of things were not anywhere near as important or as substantial as he has rendered in terms of service to this country. I have an absolutely clear conscience in rewarding him for that past contribution.

With respect to the second aspect of the sentencing, I have read your presentencing memorandum and I have reviewed with great interest, not so much what you say -- because obviously lawyers are advocates and there is always a certain credibility question on an allocution from a defendant, so I have, as all judges, of course, to be skeptical about what a defendant tells us -- but I have relied very strongly upon what I call the real evidence, the transcripts of the tape with the CIA. I think those tapes demonstrate without any question the first conversation with Marino, the hedging and the hemming and hawing and the CIA very obviously aware of them. I don't blame Mr. Marino. I think he was not into this thing; someone else, I think Reilly, was into it before him. He is confronted with a hot potato he doesn't quite know how

to respond to. That comes through in eight pages of the transcript.

What does come through loud and clear is the message delivered by Mr. Zein to the CIA. I am not saying incorrectly that he is on his own, basically. It is not a CIA operation and you are on your own and I think Mr. Zein says I know that, on those tapes. But you have created this problem for me. I think it is there on the tapes. These are contemporary statements at or about the time of the transactions in issue.

I think the situation was created by the decision of the U.S. Government, whoever made it -- I don't know who made it -- not to go forward with the original scheme of things to pay the $3 million ransom. I can only suggest to you that there are a lot of professionals out there playing on this field. Mr. Zein is a professional, the CIA people are professionals, the Bureau to some extent is professional in what they do. Then you have a lot of people in higher-level positions who represent the very desirable civilian control aspect of the government, who are not professionals and who sometimes make decisions which professionals do not understand and which professionals are forced to carry out because they have to. That is the kind of government we live under.

One could question the wisdom of the decision

but there is no question in my mind anyway that, had the original commitment been honored, maybe this would never have happened. You have the added complicated circumstance of the fact that the so-called victim here had some debts outstanding to these so-called terrorist groups, and obviously people who felt that he had stolen some money from them. You have a very complicated factual scenario here.

Mr. Zein fits into this factual scenario, dealing as he is with people whose motivations or reasoning processes may not be exactly consistent with our own and who have their own sets of rules and their own set of values. We can argue whether they were right or wrong until the cows come home. It doesn't matter. They think in certain ways, and to some extent he is dealing with that as an Arab in the Middle East, dealing with these people who have some respect for him and for whom he has some respect and affection as well. I think that comes across. Just because you categorize a person as a terrorist doesn't mean he is for all purposes irrational or not human.

I think the record that comes across in that presentencing memorandum is that these people are playing by their own sets of rules and he was playing by that set of rules, and unfortunately he found himself in a situation, as I think comes very clear on the CIA tapes, where he was

W.C

in a very perilous situation. That makes the conversation, at least the subsequent conversations with Mr. Marino after the first conversation -- when he was obviously very evasive because he didn't know quite what to say, and when you don't know what quite to say you hem and haw a lot, as I think he did -- but when the later conversations transpired, as explained to me, Mr. Marino had been briefed on the situation and he understands the problem. He cannot offer him any constructive solution, but there is at least a frank acknowledgment that it is a perilous situation in which Mr. Zein was.

Whether or not that rises to a defense of duress under the law, I think I find credible the suggestion that there was a lot of pressure being exercised upon his person to go along with this situation. I am not entirely sure that he would not have been able to make out a defense of duress under the law. Obviously, the threat of bodily harm was imminent, as even Mr. Marino will tacitly concede on those tapes when he says, "Don't go back to Beirut, you shouldn't go there." So I think there is certainly a threat of imminent danger.

The only argument against the legal availability of the duress defense would be a suggestion that he could have escaped somewhere or he could have gotten away from it. [illegible] in the real world in which he was living, in the real

WC

world in which we all live, having recently experienced the unfortunate assassination of a federal judge over a civil case, it is not entirely clear to me that, given the type of players in this game, that escape route was really available and certainly not vis-a-vis members of his family being killed in Beirut. I don't think you could put him in a witness protection program and move his entire family out of Beirut.

But even assuming as a matter of fact it doesn't rise to the level of duress defense for the reason the government suggests, there isn't any doubt in my mind there was enormous pressure operating on this person being at that point in a very exposed position as a pawn in a very complicated chess game, and I don't think the government seriously disputes that that is true. Against the backdrop of all of that, I don't think whether he made his statements to the government or didn't make these statements at the time of his arrest has a lot of qualitative significance.

The long and short of what I have resolved is that he ought not to be punished any more than he has been, assuming arguendo he should have been punished at all, given the fact that the United States Government has to bear some responsibility for putting him in that situation. You ... to me technically they may never have made a

commitment, but these Palestinians, these groups that are over there on the other side, are not going to argue the law of contracts with you. They have their own way of looking at things. As far as they were concerned, his word is a commitment and whether or not that would fly in a court of law is another question. But those are the people he was playing with. I think that to some extent the United States Government decision not to go forward with this deal because as we have subsequently found out they had other ways of trying to achieve the same objective, which turned out to be perhaps even less efficient and more politically damaging than the way in which they were proceeding with Mr. Zein, I think the government bears some responsibility.

I am not saying he is blameless, but in all fairness, as I think we try to be fair, I don't think he should be punished any more than he he has been. He has already been in jail two and a half years, and that shakes out to pretty much good time served on a five-year sentence, which is the sentence I would be inclined to impose here, subject of course to your advising me as to whether or not, given his particular offense characteristic, which is no prior criminal offenses -- the offense characteristic of course is a weighty one -- his offender characteristics go under the guidelines as applicable at the time of

WC

his offense which would probably qualify him for a favorable.

Before I impose a final sentence here -- and I don't think I need to hear from you, Mr. Zein. I think I have heard from you significantly in this case already.

THE DEFENDANT: Your Honor, there is nobody who wants to bury this case more than me. You talk about the punishment. It is not like a federal prison where I am staying, your Honor. It is a lot --

THE COURT: I have already made the decision that you should not be punished any further. I am perfectly prepared to accept your lawyers suggestion that you be released on time served now. But I don't want to do that for two reasons.

First of all, there is a matter of international relationships to be served here. The United States Government has to deal with the British Government, and a five-year sentence cosmetically may look better than a time-served sentence, even though it may translate to the same thing.

The other reason is for your own protection. It would look better for you, I think, if a sentence were imposed which looked more severe to the outside world that may not be as familiar with our parole system. In other words, I would give you any sentence that would get you out

WC



pretty much in the time you have already served. That could be a ten-year sentence, for all I know. It is largely a matter of cosmetics. I don't think you are a man who needs rehabilitation and I don't think you are a man who is going to commit another crime. If you do, you will be in trouble. But I think --

MR. VIVIANI: Would your Honor consider bail and two weeks from now --

THE COURT: I am going to defer the sentence a couple of days so I think the bail is academic. All I really want is somebody to tell me --

MR. VIVIANI: What the guidelines would be?

THE COURT: In other words, the Probation Department has not been asked to prepare a presentence report. What I would like him to do is just tell me the offender characteristics and what the presumptive guideline release statement would be, and then I will give him a sentence that will get him out at that time. That is what I am suggesting to you. This is a secret proceeding. Obviously, I would not say this type of thing in the ordinary sentence. But I am dealing with a situation in which appearances are important, both from the point of view of his safety and from the standpoint of the United States Government's ability to go to the British Government [illegible] say [illegible] hand, something to that point.

wc



I am being very candid now. I would let him out on time served now, but I think that may not be the best sentence for him.

MR. VIVIANI: I understand. If I can think out loud, since it is an old law case, and assuming your Honor would impose a five-year, given the type of offense, there would be a mandatory release, which is three years four months, which is 40 months.

THE COURT: Then I would give him four years.

MR. VIVIANI: Then the question becomes what are the guidelines on four years?

THE COURT: My experience with the Bureau of Prisons -- and I have had a lot of experience, for unlike a lot of judges, I represented criminal defendants -- my experience tells me that the guidelines will determine when he is being released.

MR. VIVIANI: Absolutely.

THE COURT: That is what I want to know. I don't have that.

MR. VIVIANI: I know. You mentioned the five-year sentence, the mandatory out, that they would give him the mandatory out.

THE COURT: You mean the max time.

MR. VIVIANI: Max time. If it is under five, there is no two-thirds out. It has to be straight

guidelines.

THE COURT: Once I sentence him, he will go to a regular prison, he won't be at the MCC any more, and to some extent he has to think about the appearance problem from the standpoint of his own safety and the safety of his family. A few more months in prison to him may not be as important as that.

MR. VIVIANI: I understand, your Honor. We will work it out.

MR. BATCHELDER: Your Honor, we will talk about it Monday.

THE COURT: I haven't heard from Mr. Gouraige. Mr. Gouraige, is what I have said inconsistent with what you would be thinking in terms of the government's relationship with the Bureau of Prisons?

MR. GOURAIGE: Your Honor spent a long time with this case, you have heard all of the evidence, you are very familiar with it. The government would accept your sentence.

THE COURT: Do you have the kind of concern I have about --

MR. GOURAIGE: We certainly do. I think your Honor is absolutely right in everything you have said.

THE COURT: In any event, between now and the time I finally impose sentence, I can put you on for Monday

MR. BATCHELDER: Could we do that?

MR. VIVIANI: Monday afternoon?

THE COURT: Monday afternoon at 5 o'clock and I will impose the final sentence.

THE COURT: If you can advise me if I gave him a five-year sentence, which looks pretty severe for a first-time defendant, that will get him out of jail now or in a few weeks, fine. If that won't do it, then you have to think about over the weekend, Mr. Zein, how these people around the world that you know better than we do are going to react to your sentence and what they are going to think based upon it.

THE DEFENDANT: The only thing is, your Honor, I agree with what your Honor is saying and I appreciate your comments, but the most important thing that has been in my mind because of this situation in Beirut and because of the disclosure in the paper about my family is, I want to get the fastest time, my brother has to leave Beirut, my sister has to leave Beirut. It is imperative.

THE COURT: Am I correct in thinking that the sentence I impose here will give these people a clue as to what your situation has been with the government?

THE DEFENDANT: Because, your Honor, my role has been decreased. So nobody outside is going to think in any way that [illegible] exaggerated or I did anything. I mean, I took it

wc



all on myself.

THE COURT: No, no, I am more concerned that you know these people better than I do, you are an Arab, I am not an Arab.

THE DEFENDANT: Because the role is small, your Honor.

THE COURT: Will these people think that because you have got a relatively small sentence in the scheme of things compared to what they would expect you to get in that community, that therefore you must have been a CIA agent all along and that will get you killed too?

THE DEFENDANT: Because they think that the government here doesn't know exactly what my role was. And whatever sentence you give, your Honor, I am in contact with them because of the hostages report, and they were trying to get me out.

THE COURT: I am only going to ask you to do two things.

THE DEFENDANT: It is not going to affect me there.

THE COURT: I am only asking you to do two things over the weekend. One, I want to be advised as to what the parole guidelines would be so I can fix an appropriate sentence that will get him out of jail now or in the immediate future, number one.

wc



Number two, I want you to think, Mr. Zein, because in the Arab world punishment is a lot more harsh than it is under our system, whether or not these people will perceive your sentence as being so lenient as to raise an inference that either (a) you were a CIA agent in the past or (b) you cooperated now. Either one I think would be bad for you. That is something I want you to think about. If you are not worried about it, then I am not going to worry about it.

THE DEFENDANT: Your Honor, let me think about it and check it out. I will advise your Honor the next time I see you. I thank you very much.

THE COURT: I am very honest in what I said. Even if I did not accept your story about the CIA pressure being created by this hostage deal, I think what you have done for the government in the past entitles you to tremendous leniency, and I don't think Mr. Gouraige would even disagree with that. That has never even been disputed.

MR. VIVIANI: 4 p.m., your Honor, Monday?

THE COURT: 5:30 might be better. Nobody will be here. This record is of course sealed. Mr. Handley knows it is sealed.

MR. HANDLEY: Yes, your Honor.

THE COURT: It is a complicated world. Mr. Gouraige seems to get all the complicated cases.

wc

MR. GOURAIGE: Thank you, Judge.

THE COURT: Do you want the transcript, Mr. Gouraige?

MR. GOURAIGE: Yes, one copy.

MR. BATCHELDER: May I have a copy?

THE COURT: It is sealed.

- - -