[Filed Under Seal[*]]

# In the United States Court of Federal Claims

No. 99-244C
(Filed: February 28, 2002)

* * * * * * * * * * * * * * * * * * * * * * *

MUSTAFA M. ZEIN,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * * *

Contracts; Limitations Period; Threats as Basis for Waiving.

*Mustafa M. Zein*, Brooklyn, N.Y., argued pro se.

*Lisa B. Donis*, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, argued for the United States. With her on the briefs were *Stuart E. Schiffer*, Acting Assistant Attorney General, *David M. Cohen*, Director, and *Donald E. Kinner*, Assistant Director.

---

OPINION

---

BRUGGINK, *Judge*.

Plaintiff appears pro se. He seeks in excess of $75 million for breach

[*]The parties shall notify the court before March 12, 2002 whether any or all of the opinion should be redacted before release to the public. Absent such notice, the opinion will be fully released.

of an alleged oral contract that he claims would have effected the release of American hostages held in Lebanon in the mid-1980s. This action was transferred to this judge on September 5, 2001, after the death of Judge Andewelt. Pending are defendant's two motions to dismiss: the first motion suggests that plaintiff's claim is barred by the six-year limitations period, 28 U.S.C. § 2501; the second is based on the Supreme Court's decision in *Totten v. United States*, 92 U.S. 105 (1875), which holds that contracts to perform secret services for the United States are unenforceable in court.

## BACKGROUND

Defendant filed its motion to dismiss based on lapse of the limitations period in 1999. During oral argument, plaintiff first raised the assertion that he delayed filing the complaint due to threats to his life and the lives of his family members. In an initial ruling on the motion, Judge Andewelt found that the plaintiff had reason to know of his cause of action no later than 1986. Nevertheless, he declined to dismiss the complaint at that time, despite the fact that it was filed at least seven years too late, because of serious allegations plaintiff had made in sealed documents concerning alleged threats to his or his family's safety by agents of the United States. These threats, according to plaintiff, deterred him from filing suit. As Judge Andewelt noted, however, plaintiff offered no good reason for not filing a complaint after 1991, when his concern for his family had ended. He nevertheless suspended consideration of the motion pending further discovery by defendant as to the basis of the assertion. Implicit in his suspension is the holding that fear for one's life could potentially toll the statue of limitations. *See* Order of Sept. 28, 2000.

Rather than follow up Judge Andewelt's suggestion that it depose plaintiff, defendant secured leave to file a second motion to dismiss, grounded on *Totten*. Defendant took the position that further discovery was unnecessary if the court had no jurisdiction to hear the case. During a status conference, Judge Andewelt disagreed with defendant's interpretation of *Totten*, and explained his view that the decision only applied to enforce an express or implied term within the contract itself requiring secrecy. Thus, for *Totten* to apply, both parties had to understand that the terms of the contract were to remain secret. Because plaintiff took the position that the terms of the contract were not secret, Judge Andewelt held the second motion in abeyance as well, pending further discovery by defendant. *See* Order of Jan. 24, 2001.

On May 10, 2001, defendant filed a status report indicating that it would not depose plaintiff because doing so would inevitably compromise national

security. Even if plaintiff's allegations were untrue, any deposition, according to the government, would of necessity reveal classified information. After additional status conferences, on October 29, 2001, the court ordered plaintiff to assert in an affidavit the particular reasons that he could not "bring suit before the expiration of the statute of limitations." The court has received that affidavit, defendant has responded to it, and the plaintiff has replied. The court now views the motion to dismiss based on failure to timely file as ready for ruling.[1/]

According to his complaint, plaintiff was a successful businessman and private consultant in the Middle East. He also acted as a mediator for national governments and multinational corporations during some turbulent events in the 1970s. Plaintiff formed very close relationships with some officers of United States agencies, including Robert Ames, an American official at the United States Embassy in Beirut, Lebanon. In early 1985, because of plaintiff's many Middle Eastern contacts, representatives of the United States allegedly approached plaintiff and asked if he would be willing to assist in obtaining the release of American hostages being held in Lebanon by a terrorist organization. Plaintiff agreed to help and did not request compensation for his assistance.

According to plaintiff, the organization holding the American hostages demanded, as one condition for the release of the hostages, that the Kuwaiti government free 17 prisoners who were being held in Kuwaiti jails. Plaintiff alleges that the United States intended to use plaintiff as an intermediary through whom the United States would obtain the release of the prisoners while at the same time being able to deny any involvement with their release. Plaintiff claims that he had to approach the organization holding the hostages and the Kuwaiti officials through an unnamed Palestinian organization that was on good terms with both groups. At that time, the Palestinian organization was trying to collect a $3 million debt from a Middle Eastern ambassador living in London. Consistent with the United States' request that plaintiff offer the Palestinian organization a reward for their assistance, plaintiff proposed a plan whereby the United States would pay the Palestinian organization the $3 million debt owed by the ambassador in exchange for the organization's help in securing the release of the prisoners in Kuwait and, in turn, the release of the American hostages in Lebanon. Upon release of the hostages, the United States government would give plaintiff the $3 million to turn over to the

---

[1/]In view of the court's ruling herein, it is unnecessary to consider defendant's alternative grounds for dismissal based on *Totten*.

Palestinian organization. Plaintiff alleges that this plan was presented to government officials in Washington, D.C., and ultimately approved and "guaranteed" by the White House.

Because of this guarantee, plaintiff began trying to obtain the release of the American hostages. Plaintiff entered into discussions with the Palestinian organization in which he personally guaranteed the payment of the $3 million. Plaintiff claims that, during these efforts in March 1985, individuals acting on behalf of the United States government planted a bomb in the southern sector of Beirut that was intended to kill plaintiff. Plaintiff was not harmed in the blast, but eighty people were killed. Shortly after the bomb explosion, notwithstanding the asserted White House guarantee to pay the $3 million and plaintiff's reliance thereon, the United States abruptly modified the plan in the midst of plaintiff's operation. Instead of paying a lump sum of $3 million upon release of the hostages, the United States set out six specific steps to be taken by the Palestinian organization and agreed to make a $500,000 payment upon the completion of each step. Plaintiff informed the Palestinian organization of the new terms of their agreement, and the organization went on to complete four of the six steps without any payment from the United States. Despite the bombing and the change in the terms of the agreement, plaintiff continued his work on behalf of the United States government and allegedly succeeded in setting into motion events that led to the release in Lebanon of one of the hostages.

In July 1985, according to plaintiff, representatives of the United States informed him that it appeared that the United States was not going to go through with plaintiff's plan to secure the release of the American hostages but that the United States would do its best to make payment to the Palestinian organization for its efforts. By November 1985, however, plaintiff understood that the United States would not make any payment. Instead of pursuing plaintiff's plan to secure the release of the remaining hostages, plaintiff alleges, the White House decided to secure their release through an arms-for-hostages deal.

The Palestinian organization held plaintiff personally responsible for the $3 million it considered owed to it by the United States government. The organization allegedly threatened the lives of both plaintiff and his family, telling plaintiff that "his life was theirs." Plaintiff informed a United States official of his plight but was told that "he was on his own." Ultimately, in 1986, plaintiff arranged for someone else to pay off the debt.

According to court records in the United States District Court for the Southern District of New York, in January 1986, plaintiff was arrested for demanding ransom for a kidnapped person in violation of 18 U.S.C. § 875. The allegations of kidnaping did not involve the American hostages being held in Lebanon. Plaintiff was held for thirty months in jail without bail or a trial. He was released in June 1988 after a series of in-camera hearings in which he pleaded to one count and was sentenced to time served. Later that summer, plaintiff was briefly jailed again for improperly obtaining a visa after he had already received a green card.

On April 26, 1999, nearly fourteen years after the United States allegedly reneged on its agreement to go through with plaintiff's plan to secure the release of the American hostages in Lebanon, plaintiff filed this complaint. Plaintiff characterizes the United States' actions as a breach of contract and alleges that as a direct and proximate result of that breach, and the resulting threats to his family, plaintiff was forced to complete the contract, i.e., secure payment of the $3 million. Plaintiff also alleges that his subsequent incarceration for two and one-half years pending possible extradition to the United Kingdom was a direct result of the breach of contract and that he lost his good name, reputation, and ability to make a living as an international consultant.

Plaintiff's most recent affidavit, while lengthy, contains virtually nothing that is directly responsive to the court's order that plaintiff furnish whatever evidence he has to support his claim that fear for himself or his family prevented a timely filing. The following language is the only portion that attempts to explains the delay:

> . . . . The plaintiff herein was preparing to file in this court in 1990 before the Statute of Limitations ran out. I was stopped dead in my tracks when the pro-American thugs, who are now fugitives from justice residing in the U.S.A. sent me a message I could not ignore. They robbed my brother, completely cleaning out his car dealership of cars imported from Germany. The message was: "We took your family's wealth (112 cars in total, mostly Mercedes and BMW's), the next time it will be your brother's life. If these thugs, killers and drug traffickers did not flee Lebanon, plaintiff herein would never ha[ve] dared file[] any case against the United States Government in any court of law.

DISCUSSION

The six year limitations period of 28 U.S.C. § 2501 is jurisdictional. *See Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96 (1991). It cannot be waived by the court. Exceptions to it are rare. The only two recognized in the past in this circuit are "inherent unknowability" and government concealment. *Japanese War Notes Claimants v. United States*, 373 F.2d 356, 359 (Ct. Cl.), *cert. denied,* 389 U.S. 971 (1967). Nevertheless we will assume for argument's sake only that threats by the government, as distinct from threats by others, would toll the running of the limitations period. Threats are not dissimilar in rationale to fraudulent concealment. The difficulty for plaintiff is that his allegations, even if taken at face value, would not justify tolling the limitations period even if that were the law.

First, "pro-American thugs" are not the United States.[2/] Nowhere in his affidavit does plaintiff assert that agents of the government threatened him or his family. The court declines to extend the principle of tolling to actions that are not directly attributable to the government. Second, he does not allege that the threats were directed at his own physical well-being. While the court can understand that he would be frightened for his brother, the court will not extend the legal concept of potential waiver beyond threats to plaintiff himself. Finally, the court finds that the internal inconsistencies pointed out by Judge Andewelt have not been explained. Under the view of the facts most favorable to plaintiff, he knew by 1991 about the alleged breach and the hostages had been released. The explanation that he delayed filing pending access to the sealed transcript of his district court proceedings makes no sense, as Judge Andewelt explained earlier. The court has read those transcripts and is satisfied that they do not assist plaintiff. The claim here is independent. Nor do they support plaintiff's assertion that the district judge's instructions constituted a threat if he did not plead guilty.

We agree with Judge Andewelt's assessment that the rest of his rationale was contrived. Indeed the tone of plaintiff's explanation is fundamentally at odds with his insistence that there never was an agreement to keep the terms of the contract "secret in any way, shape or form, because of the absolute impossibility to execute the contract if its terms were to be kept secret . . . The lips of both Defendant and Plaintiff could *not* be kept *sealed* in

---

[2/]Plaintiff used this same phrase–"pro-American thugs"–in his Affidavit of November 20, 2001, at p. 24, to describe participants in an alleged attempt to kill plaintiff with a bomb.

this case. . . ." Plaintiff's Status Report of January 21, 2001, p. 2 (emphasis in original). He was sufficiently unconcerned about connecting himself to the events in Lebanon in the 1980's that he wrote an op ed piece in the Washington Post, published on December 16, 1990, in which he identified himself as a Lebanese-born businessman "who lives in New York. He served on many occasions during the 1970s and 1980s as an intermediary between the United States and the PLO." Attachment to Plaintiff's Affidavit of November 27, 2001.

Despite the unusual nature of the contract alleged here, it is not unreasonable to put the plaintiff to his proof. First, because he bears the burden of establishing facts necessary to support the court's jurisdiction. Second, because information supporting the allegation that threats precluded filing the suit would be uniquely available to plaintiff.

Plaintiff has had an opportunity to explain why this action, filed fourteen years after the government's alleged breach, should not be dismissed. His explanation is insufficient as a matter of law. The action is untimely and thus beyond our authority to hear.

CONCLUSION

Defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) as untimely is granted. The Clerk is directed to dismiss the complaint. Judgment accordingly. No costs.

ERIC G. BRUGGINK
Judge